HEARD NOVEMBER TERM, 1877.

## DAVENPORT *vs.* CALDWELL.

Where two slaves, persons of color, went through the form of marriage, lived together as husband and wife for a number of years, and died leaving issue before the general emancipation took place: *Held*, That, under the statutes passed under and since the Constitution of 1868 was adopted, said persons were to be considered in law as husband and wife—their children legitimate, and capable of inheriting from each other under the Statute of Distributions.

Where an inferior Court is without jurisdiction its proceedings are null and void, and may be so treated whenever they come before another Court for consideration.

The Court of Probate has no jurisdiction in cases for the partition of real estate.

BEFORE NORTHROP, J., AT ABBEVILLE, SEPTEMBER TERM, 1877.

This was a petition by Elihu Davenport and Katie, his wife, against Elizabeth Caldwell, for partition of real estate and account, originally brought in the Court of Probate for Abbeville County, and appealed to the Circuit Court of the same County.

The facts appear in the following statement prepared by counsel:

Many years ago a colored man named Joe, a slave of John Caldwell, of Newberry County, and a colored woman named Nancy, a slave of Edward Pitts, of Newberry County, lived together as man and wife, or were married according to the custom usual among persons in their station of life. They both remained in slavery until their deaths, which occurred, respectively, more than thirty years ago, and from their connection were born Willis Caldwell and Katie Davenport, who were both slaves until the general emancipation. Katie married Elihu Davenport, and they have both resided in Abbeville County for some years. On the 25th of February, 1875, Willis Caldwell, also a resident of Abbeville County, died intestate, leaving a small tract of one hundred acres of land and some personal property. He left surviving him his widow, Elizabeth Caldwell, whom he had married when they were both slaves and continued to live with as his wife until his death, and who took out letters of administration upon his personal estate on the 22d June, 1875; but he left no children or lineal descendants.

On the 17th of November, 1875, Elihu Davenport and Katie, his wife, brought suit against Elizabeth Caldwell, claiming that Katie is an heir-at-law and distributee of Willis Caldwell, deceased, and, as his sister, entitled to one-half of his estate, and praying that a partition might be had of his real estate, and that the defendant, as administratrix, might be compelled to account for his personal estate.

The answer denies that Katie Davenport is an heir-at-law or distributee of Willis Caldwell, and denies the right of the plaintiffs, or either of them, to demand of the defendant the account and partition prayed for.

The Judge of Probate made a decree in favor of the petitioner for partition of the real estate and an account of the personalty.

The defendant appealed to the Circuit Court upon the following grounds:

1. Because Willis Caldwell, the intestate, and Katie Davenport, the petitioner, having been born slaves, and having remained slaves until the general emancipation of slaves, the latter possesses no rights, absolute or relative, that have not been conferred upon her by law since emancipation.

2. Because the said Willis Caldwell and Katie Davenport having been born of a woman who lived in the state of concubinage at the time of their births, respectively, the said Katie Davenport is the illegitimate child of her mother, and is incapable of inheriting or of taking, under the Statute of Distributions, the property of the said intestate, Willis Caldwell.

3. Because Joe, the putative father of Willis Caldwell and Katie Davenport, having lived and died in slavery, never possessed the right or capacity so to recognize or acknowledge as his children the said Willis and Katie as to confer legitimacy upon them or upon either of them.

4. Because there is no proof that Joe, the putative father, ever, at any time during the lifetime of Nancy or afterwards, acknowledged or recognized the said Willis and Katie, or either of them, as his children.

5. Because the petitioner, Katie Davenport, is not a distributee of the intestate, Willis Caldwell, and the petition should have been dismissed.

6. Because the decree does not define or fix the share of the intestate's estate to which the petitioner is entitled and is void for uncertainty.

His Honor the Circuit Judge decreed as follows:

It is ordered and adjudged that the appeal be dismissed, and that the Clerk of this Court certify this judgment to the Probate Court for such further proceedings as may be deemed proper by the Judge thereof.

The defendant appealed on the following grounds:

1. Because Willis Caldwell, the intestate, and Katie Davenport, the petitioner, having been born slaves, and having remained slaves until the general emancipation of slaves, the latter possesses no rights, absolute or relative, that have not been conferred upon her by law since emancipation.

2. Because the said Willis Caldwell and Katie Davenport having been born of a woman who lived in the state of concubinage at the time of their births, respectively, the said Katie Davenport is the illegitimate child of her mother, and is incapable of inheriting or of taking, under the Statute of Distributions, the property of the said intestate, Willis Caldwell.

3. Because Joe, the putative father of Willis Caldwell and Katie Davenport, having lived and died in slavery, never possessed the right or capacity so to recognize or acknowledge as his children the said Willis and Katie as to confer legitimacy upon them or upon either of them.

4. Because there is no proof that Joe, the putative father, ever, at any time during the lifetime of Nancy or afterwards, acknowledged or recognized the said Willis and Katie, or either of them, as his children.

5. Because the Court of Probate cannot exercise jurisdiction of petitions for partition of real estate where any dispute exists in relation to the title thereof.

6. Because the Act of the Legislature conferring jurisdiction upon the Courts of Probate in cases of partition of real estate is unauthorized by the Constitution of South Carolina, and is, therefore, null and void.

7. Because the Act of 1872 "legalizing certain marriages," &c., is in conflict with Section 39 of Article I of the Constitution of South Carolina, and is, therefore, null and void.

8. Because the petitioner, Katie Davenport, is not a distributee of the intestate, Willis Caldwell, and the petition should have been dismissed.

9. Because the decree does not define or fix the share of the intestate's estate to which the petitioner is entitled and is void for uncertainty.

*Burt*, for appellant, filed a brief, containing the following points of law and authorities:

1. That, as slaves, Joe and Nancy were not husband and wife, and their relation was not marriage but concubinage.

2. That the respondent, Katie Davenport, and the intestate, Willis Caldwell, were the natural children, if their children at all, of Joe and Nancy.

3. That, as emancipated slaves, the respondent and the intestate had no civil rights that were not conferred on them by emancipation or by statute.

4. That, as natural children, they had no capacity to inherit or take property or to transmit it from one to the other.

5. That the respondent, claiming an exemption from the disability of bastardy, must show that her disability has been removed.

6. That legitimacy can be conferred only by statute.

7. That the right of a putative father to recognize is a power, and there must be a grantee of the power and an act of recognition under it.

8. That the statute of 1872 relates to individuals only or a class of persons and is a private Act.

9. That it violates the Constitution of South Carolina, in that it is a discrimination in favor of colored persons.

10. That the Act conferring on the Probate Court jurisdiction in partition is unconstitutional.

11. That, if not unconstitutional, in this case the title to the land is in dispute, and the Probate Court has not jurisdiction.

Slaves in South Carolina had no civil rights—were incapable of making any contract—were mere personal chattels.—Act of 1740, Stat. at Large; *Lenior* vs. *Sylvester*, 1 Bail., 642; *Gregg* vs. *Thomson*, 2 Mill, 231; *Gist* vs. *Toohay*, 2 Rich., 425. Consent of parties capable to contract, and not ceremony, necessary to valid marriage. Consent may be declared or presumed from reputation and cohabitation.—2 Kent Comm., 85, 87.

A slave cannot legally contract marriage. The union of slave and slave or slave and free negro is concubinage merely.—O'Neall's Negro Law, § 37, p. 23.

A bastard is a child born out of lawful wedlock and cannot inherit or transmit property.—1 Chit. Black., 379.

A bastard cannot claim under a devise to children generally, though the implication be strong in his favor.—5 Ves., 530; 1 Ves. & Bea., 434.

In contemplation of law, children mean legitimate children.— 7 Ves., 458; 1 Bouv. L. D., 244.

Katie Davenport, then, being a bastard and an emancipated slave, cannot inherit property or take under the Statute of Distributions unless the capacity to do so has been conferred by the Constitution or by statute. A bastard can be made legitimate only by Act of Parliament.—1 Chit. Black., 379.

The Constitution of 1865 merely forbids the existence of slavery— does no more.

Emancipation conferred only such civil rights as are not denied to colored persons. Legitimation of bastards did not ensue from emancipation.

The statute of 1865, Section 4, p. 31, is: "Every colored child heretofore born is declared to be the legitimate child of his mother, and also of his colored father, if he is recognized by such a father."

The Act of 1866 confers on colored persons all the rights of personal security, personal liberty and private property which white persons have, and prevents discrimination between the races, and repeals the Act of 1865. Both Acts are repealed by Revised Statutes.

The Constitution of 1868 does not confer legitimacy, but merely prohibits the denial by legislation of the rights of person and of property. Article I, Section 12, gives nothing but mere equality of rights.

The Revised Statutes became law February 10, 1872, and the Act of 1872, p. 183, became a law March 12, 1872.

Chapter CXLVI, Section 3, p. 760, provides that "the repeal of the Acts and resolves, and parts of Acts and resolves, revised and re-enacted herein, or repugnant to the provisions hereof, shall not revive any law heretofore repealed or superseded."

Section 10 of the same Chapter provides "that all and every part of the common law of England, where the same is not altered by this Act, or inconsistent with the Constitution, customs and laws of this State, is hereby continued in full force and virtue in this State in the same manner as before the adoption of this Act."

As there is nothing in the Revised Statutes conferring legitimacy, the rule of the common law is made the law which applies to bastards, and this was the law from February 10 to March 12, 1872.

The Act of March 12, 1872, is as follows:

"AN ACT LEGALIZING CERTAIN MARRIAGES, AND FOR OTHER PURPOSES THEREIN MENTIONED.

"SECTION 1. *Be it enacted* by the Senate and House of Representatives of the State of South Carolina, now met and sitting in General Assembly, and by the authority of the same, That all persons in the State of South Carolina who, previous to their actual emancipation, had undertaken and agreed to occupy the relation to each other of husband and wife, and are cohabiting as such, or in

any way recognizing the relation as still existing at the time of the passage of this Act, whether the rights of marriage have been celebrated or not, shall be deemed husband and wife, and be entitled to all the rights and privileges and be subject to all the duties and obligations of that relation in like manner as if they had been duly married according to law.

"SEC. 2. And all their children shall be deemed legitimate, whether born before or after the passage of this Act; and when the parties have ceased to cohabit before the passage of this Act, in consequence of the death of the woman, or from other cause, all of the children of the woman recognized by the man to be his shall be deemed legitimate: *Provided, however,* That no provision of this Act shall be deemed to extend to persons who have agreed to live in concubinage after their emancipation.

"SEC. 3. All Acts or parts of Acts inconsistent with this Act are hereby repealed.

"Approved March 12, 1872."

The Act of 1872 contemplates and describes persons in existence at the time of its passage and no others: "All persons in the State," &c.

There are four conditions of the legitimation of persons mentioned in the first Section: 1. That the man and woman had been emancipated. 2. That they had lived together as husband and wife. 3. That they were living as such at the passage of the Act, March 12, 1872. 4. That the man and woman both were living at that time.

Section 2 declares that the children shall be deemed legitimate. The words "and when the parties" mean the man and woman described in the first Section. No other persons are mentioned.

The existence of the man at the passage of the Act is plainly intended, as the death of the woman is mentioned.

The recognition of the children by the man plainly implies the existence of the man at the time of the passage of the Act.

The word "recognized" means acknowledged or recognized at the time of the passage of the Act or subsequently recognized. It does not mean past recognition.

To construe the words "recognized by the man" to mean antecedent and not present or future recognition would be to make the Act retroactive without that being the clear and necessary meaning of the words used. Such a construction is forbidden.

The rule is, that a retrospective meaning shall not be given to the words of a statute unless the intention of the Legislature is beyond doubt.—9 Bac. Abr. Stat., 235; Sedgw. Stat. and Cons., 187–190.

Statutes can never be applied retrospectively by mere construction.—*Ibid.*

That meaning is forbidden by the rule that "statutes are not presumed to make any alteration in the common law further or otherwise than the Act expressly declares."—9 Bac. Abr. Stat., 245; Sedgw. Stat. and Cons., 315.

Such a construction is forbidden by the further rule that a private statute must not bear a liberal construction.—9 Bac. Abr. Stat., 257.

There is still another rule which disallows the construction that antecedent recognition is the meaning of the Legislature: "If any part of a statute be obscure, it is proper to consider the other parts; the words and meaning of one part of a statute frequently lead to the sense of another."—*Ibid*, 239.

The Act of 1872, Section 2, does not declare the children of the deceased woman legitimate unless they are recognized by the man. The recognition of the man, then, is the condition of their legitimacy and confers it; it is a condition precedent. A condition precedent must be complied with, and if it be impossible no estate or right can vest.—2 Thom. Co. Litt., 18–22; 2 Black. Com., 154; 2 Freem., 186.

Recognition, then, is a condition, and, whether it be a condition precedent or a condition subsequent, it is a fact and must be proved; it cannot be presumed.

The respondent claims an exemption from a common disability of bastards; she claims that her disability has been removed, and she must show it beyond doubt.

No privilege is granted unless it be conveyed in plain and unambiguous words, testifying the intention of the Legislature in a manner too plain to be misunderstood.—21 Penn., 9; 25 *id.*, 394; Sedgw. Stat. and Cons., 302.

The authority to legitimate the children of the woman by the recognition of the man is a grant of legislative power. The Act of 1872, page 163, gives to white fathers power to legitimate their colored children by will in certain cases. "There must be a grantee, donee, and that he be a person capable of the thing granted and

not disabled to receive it," and an acceptance of it.—Coke, 11–73; Plowd., 555; Shep. Touchst., 229.

Joe, the putative father, having been dead many years before emancipation, the grant as to him was void.

Recognition merely, or marriage of a putative father and mother, and subsequent recognition of children born before marriage, cannot confer legitimacy.

If, then, bastards can be made legitimate only by Act of the Legislature, and recognition be a condition, it follows that the recognition must be in pursuance of the power given, and necessarily subsequent to the Act.

By the civil law the marriage of the parents legitimates their children, and the rule has been adopted in many of the States by the Legislatures.

In North Carolina and Illinois marriage and recognition make them legitimate; but the recognition in the former State must be by petition of the father after the marriage and in the latter before an officer.—2 Bouv. L. D., 30.

The words "recognized by the man" in the ordinary or common meaning express present recognition, and to make them mean past recognition, other words, such as "have been," "at any time," must be added, and this the Court has no power to do.

"The best rule to arrive at the intention and meaning of the law is to abide by the words the law-maker has used."—9 Bac. Abr., rule 2, p. 238.

In *Green* vs. *Wood*, (7 Q. B., 178–185, Sedgw., 245,) Lord Denman said: "We are bound to give to the words of the Legislature all possible meaning which is consistent with the clear language used; but if we find language used which is incapable of a meaning we must not supply one."

Lord Coleridge said: "The longer I sit here the more I feel the importance of seeking only the meaning of a statute according to a fair interpretation of its words and resting there."—Sedgw. Stat. and Const., 245.

Chief Justice Tyndall said: "It is the duty of all Courts to confine themselves to the words of the Legislature—nothing adding and nothing diminishing."—Sedgw. Stat. and Const., 246.

Whether the recognition of the man be past, present or future, it must be proved, and there was in this case no proof whatever of recognition by the man.

The Act of 1872 is unconstitutional.

We have seen that it legalizes the marriages of certain colored persons and confers legitimacy on certain colored children without conferring the same rights on white persons in the same circumstances.

Section 39 of Article I of the Constitution of 1868 is as follows: "No title of nobility or hereditary emolument shall ever be granted in this State. Distinction on account of race or color, in any case whatever, shall be prohibited, and all classes of citizens shall enjoy equally all common, public, legal and political privileges."

Probate Courts have not jurisdiction in partition.

The Constitution establishes Probate Courts and defines their jurisdiction in the following words: "A Court of Probate shall be established in each County, with jurisdiction in all matters testamentary and of administration, in business appertaining to minors and the allotment of dower, in cases of idiocy and lunacy and persons *non compos mentis.*"

A statute creating a new jurisdiction must be construed strictly.— 9 Bac. Abr., 245; Dwarris on Stat., 259.

Probate Courts have special or limited powers and are inferior Courts.

"Technically, an inferior Court is one of limited jurisdiction, and its jurisdiction must appear on the face of its proceedings, else they are void."—*The State* vs. *Fillebrowne*, 2 S. C., 407.

"A Court of special or limited jurisdiction can claim nothing that is not expressly granted. It has no constructive powers."— *McKensie* vs. *Ramsay*, 1 Bail., 457; *Bloom* vs. *Bostick*, 1 Hill, (N. Y.,) 130.

In a dissenting opinion of Chief Justice Moses, in *McNamee* vs. *Waterbury*, (4 S. C., 156,) he says: "To determine the extent of the jurisdiction of that Court [Probate] we must look to the Constitution—the Legislature is impotent to confer by Act any additional powers."—pp. 167–8.

"When the exercise of a power is claimed for a Court of limited jurisdiction, it must be shown to exist by express grant or necessarily consequent upon some power clearly given."—*Ibid.*

In *Walker* vs. *Veno*, (6 S. C., 462,) the Court say: "It may be conceded, too, that when a new jurisdiction is conferred by statute on an inferior Court, its action under it will be void unless it be in conformity with the conditions prescribed for the exercise of such jurisdiction."

In *Ex parte Carson*, (5 S. C., 117,) this Court refused to issue a writ of *certiorari* because the power was not expressly granted by the Constitution.

In *Waller* vs. *Cresswell*, (4 S. C., 353,) this Court ordered the constitutional power of the Probate Court to entertain a suit by an adult ward against his guardian to be argued, notwithstanding the Act of the Legislature.

Partition of real estate is not granted by the Constitution, and the power is not "consequent" upon any jurisdiction that is expressly given.

If the Legislature may not confer upon an inferior Court a power not granted by the Constitution, the Act in Revised Statutes, Section 40, p. 573, is unconstitutional, and the Probate Court has no jurisdiction in case of partition.

The Constitution of 1790 and that of 1865 vested the judicial power in such superior and inferior Courts as the Legislature might from time to time direct and establish.

The Constitution of 1868 creates the Courts and distributes the judicial power amongst them, delegating no power to the Legislature to increase or diminish their jurisdiction.

In *Newell* vs. *The People*, (3 Seld., 97,) the Court of Appeals of New York say: " Whether we are considering an agreement between parties, a statute or a Constitution, the thing we are to seek is the thought it expresses. To ascertain this, the first resort is to the natural signification of the words employed in the order and grammatical arrangement in which the framers of the instrument have placed them—that which the words declare is the meaning of the instrument—and neither Courts nor Legislatures have any right to add to or to take away from that meaning." To the same effect is the Supreme Court of the United States.—2 Cranch, 358.

A Constitution is the permanent will of the people, is the supreme law, and paramount to the power of the Legislature.

"In this and all other countries where there is a written Constitution, designating the powers and duties of the Legislature as well as the other departments of the government, an Act of the Legislature may be void as against the Constitution."—1 Kent Com., 448; Story on Cons.

In *Marbury* vs. *Madison*, (1 Cranch, 137,) the Supreme Court say: " If the Constitution does not control a legislative Act repugnant to it, then the Legislature may alter the Constitution by an ordinary Act."

If the Legislature may enlarge the jurisdiction of the Probate Court by adding a single power, it can abrogate the Constitution itself in any and all of its provisions.

Rules applicable to the construction of the Act of 1872 and the constitutional grant of jurisdiction to the Probate Court:

As to the consideration of hardship or policy in construction, in *Smith* vs. *Rues,* (2 Sumn., 354–5,) Mr. Justice Story said: "It is not for Courts of justice to provide for all the defects or mischiefs of imperfect legislation."

In Conflict of Laws, p. 17, he says: "Arguments drawn from impolicy or inconvenience ought to have but little weight. The only sound principle is to declare *ita lex scripta est*—to follow and obey."

To the same purport is the language of Mr. Justice Taunton, Dwarris, 597; the Supreme Court U. S., in *McIver* vs. *Ragan,* 2 Wheat., 25; Lord Campbell, in 4 Ellis & Black., 670–9; Lord Abinger, in 4 Mees & Wels., 63.

In *Portman* vs. *United States,* (4 Dallas, 30,) the Supreme Court U. S. say: "By the rules which are laid down in England for the construction of statutes, the British Judges have assumed a legislative power, and, on the pretense of judicial construction, have in fact made a great portion of the statute law of the kingdom."

*In re Powers,* (25 Vermont, 265,) Chief Justice Redfield says: "It is scarcely necessary, at this late day, to say that the judicial tribunals of the State have no concern with the policy of legislation."

The citations might be almost indefinitely multiplied.

If these rules have been solemnly announced by learned Judges in England and the United States for the Courts of general jurisdiction, are not they to be applied, in all their integrity, to inferior Courts?

The tendency of the judicial mind is to disavow any right to construe statutes according to considerations of policy or hardship and to recognize the duty of conforming to the will of the law-making body.—Sedgw. Stat. and Const., 337–80.

See also the case of *Colston* vs. *Quander,* Virginia Law Journal, November, 1877, pp. 689 and 641.

There was no proof in this case of any marriage ceremony having been performed, nor, if any, of the consent of the master of either Joe or Nancy.

*McGowan,* contra:

It cannot be necessary to do more than state the propositions and cite the Constitution and laws upon the subject of this appeal. The deceased died intestate, and this is a simple application for partition and division under the Statute of Distributions. If these were white people there would not be a question.

1. "If the intestate shall leave no lineal descendant, but shall leave a widow, or brother, or sister, the estate shall be distributed in the following manner: The widow shall be entitled to one moiety and the other moiety shall be equally divided between brothers and sisters of whole blood," etc.—Rev. Stat., 438.

2. The statute makes no reference to color, and it is admitted that since emancipation former slaves, being persons, have all the rights of other citizens—to marry, to have heirs, to acquire property, to will it or transmit by descent under the statute.

3. But it is insisted that the disabilities of slavery still exist among persons now living as to every act that occurred during slavery; that none of the effects of emancipation are retrospective, but are only prospective; that Katie is *not the sister* of Willis, but Betsey *is his widow* and entitled to the whole of his estate. The marriage of Willis, as well as that of his father, Joe, was during slavery—the only difference being that Willis was alive in 1872 and Joe had died long before. That is the only difference.

To this we object, for the following among other reasons:

I. The Statute of Distributions [1872] makes no distinction as to color or former condition.—Rev. Stat., 438.

II. Emancipation, being the removal of civil disabilities, has the effect of a declaratory law. The disabilities were removed as an incident and consequence of emancipation itself.

III. That the Constitution and laws upon the subject are expressly retrospective and meant to be so.—Constitution, Art. I, §§ 1, 12; Act 1865, 13 Stat., 31; Act 1866, 11 Stat., 393; Act 1872, 14 Stat., 184.

IV. The object of the Acts of 1865–66 is plain. The first says: "Every colored child heretofore born is declared to be the legitimate child of his mother, and also of his colored father if he is acknowledged by such father."

"Cohabitation with reputation or recognition of the parties shall be evidence of marriage," etc. [1865.]

The Act of 1866 says: "That all persons hitherto known in law in this State as slaves, &c., shall have the right to make and enforce contracts, &c., *to inherit,* to purchase, &c., and to have full and equal benefit of the rights of personal security, personal liberty, &c., *and all remedies and proceedings for the enforcement and protection of the same,"* &c.

Under these Acts there could be no doubt. These children of Nancy and Joe were "heretofore born." Nancy and Joe "cohabited as man and wife," and that is the statutory evidence of their marriage. "Nancy and Joe lived together as man and wife, or were married according to the forms usual among colored people at that time, &c., and from this connection were born Willis and Katie."

According to the statute of 1865 *they were man and wife.* They were in violation of no moral law. Their relation was not concubinage, and their children have been properly declared legitimate.

V. But it is said that Act was repealed by the statute of 1866, and that again was repealed by General Statutes, March 9, 1872, and that the Act of 1872, (March 12,) is the only law now upon the subject.

1. This Act is not well worded; but, construed in connection with the other Acts, "*in pari materia,*" there can be no doubt of the intention.—Dwarris on Stat.; Bac. Abr. Stat., letter I.

2. It must be construed in the light of the Constitution of 1868, which had then been passed.

3. But even according to its terms it covers this case. " *The children recognized by the man to be his shall be deemed to be legitimate."* These children were recognized by Joe to be his.

*a.* Joe and Nancy were married and lived together as man and wife. That is the highest proof that he "recognized them."—See evidence.

*b.* The recognition is not required when the parties, as here, were married morally and in such way as the law recognizes as legal.

No one doubts the object of the Act to legitimize children born in slavery. One of the cardinal rules of construction is to interpret a law so as to repress the mischief and advance the remedy— "*que hæret in litera, hæret in cortice."*—Bac. Abr. Stat., letter I.

The Act of 1872 was passed in the light of the Constitution, which declares that "all men are born free and equal." This Act of 1872 bestows upon certain persons rights of which they had been deprived, *the purpose of the Act being to make all equal.* It is a

singular perversion of the spirit of the Constitution, which regards as forbidden by it that which was the very object of it.

The Act of 1872 refers to no class, but is general in its terms— "all persons," &c. If the mischief intended to be remedied is only found in a certain class, that does not make the law unconstitutional. That is "no distinction *on account* of race or color," but *on account* of their disabilities, to remove which is its beneficent object.

November 27, 1878. The opinion of the Court was delivered by

HASKELL, A. J. The questions arise out of a proceeding in the Court of Probate by Elihu Davenport and Katie, his wife, against Elizabeth Caldwell, the widow and administratrix of the goods and effects of one Willis Caldwell, who died intestate, possessed of land and personal property, but leaving no lineal descendant. Katie Davenport, claiming to be an heir-at-law and distributee of Willis Caldwell, and, as his sister, entitled to one-half of his estate, prays for partition of real estate and for an accounting, &c. The answer denies that Katie Davenport is heir-at-law or distributee of Willis Caldwell and denies the plaintiff's right to demand the account and partition prayed for. Willis Caldwell was a "person of color," as are also all the parties to this proceeding, and all formerly slaves. The important point of law decided in the Court below, and appealed from, is that the offspring of a female slave, and born in slavery, remaining slaves until the general emancipation, which took place in 1865, may, under the existing laws of this State, be the legitimate children of the parent—brothers and sisters to each other—and, as such, capable of inheriting under the Statute of Distributions. The decision sustained in the Court below, while it grants, in substance, the prayer of the petitioner, does not, perhaps, define her relationship to the deceased, whether it be of the whole blood or the half blood; whether they be the legitimate children of the mother only, or of the mother and the father. That is a question really involved in the case, and the Court deems it proper to consider the case as an entirety, and, if possible, dispose of the whole question.

The facts upon which the decision rest are stated in the brief, as follows:

"Many years ago a colored man named Joe, a slave,   *  * and a colored woman named Nancy, a slave,   *  *  lived

together as man and wife, or were married according to the custom usual among persons in their station of life. They both remained in slavery until their deaths, which occurred, respectively, more than thirty years ago, and from their connection were born Willis Caldwell and Katie Davenport, who were both slaves until the general emancipation."

The question is whether Katie is the sister of Willis in the legal sense of the word, and whether they are the legitimate children of the mother only, or of the mother and the father named?

The Act of 1865, (13 Stat., 269,) entitled "An Act to establish and regulate the domestic relations of persons of color," &c., contains important legislation upon the subject. So much of the Act as may be pertinent is as follows:.

"I. The relation of husband and wife amongst persons of color is established.

" II. Those who now live as such are declared to be husband and wife.

" III. In case of one man having two or more reputed wives, or one woman two or more reputed husbands, the man shall, by the first day of April next, select one of his reputed wives, or the woman one of her reputed husbands, and the ceremony of marriage between this man or woman and the person so selected shall be performed.

" IV. Every colored child heretofore born is declared to be the legitimate child of his mother, and also of his colored father, if he is acknowledged by such a father.

" V. Persons of color desirous hereafter to become husband and wife should have the contract of marriage duly solemnized.

" VI. A clergyman, the District Judge, a Magistrate, or any judicial officer, may solemnize marriages.

" VII. Cohabitation, with reputation or recognition of the parties, shall be evidence of marriage in cases criminal and civil.

" XII. The relation of parent and child amongst persons of color is recognized, confers all the rights and remedies, civil and criminal, and imposes all the duties that are incident thereto by law, unless the same are modified by this Act or some legislation connected herewith.

" XIII. The father shall support and maintain his children under fifteen years of age, whether they be born of one of his reputed wives or of any other woman."

Several clauses are inserted here which may not be now of force, but they are here put in that each part of the Act may be more conveniently viewed in connection with its context and the weight of the latter be brought to the aid of construction. The term "persons of color," by the preliminary Act passed at the same session, (13 Vol., 245,) is used to designate "all free negroes, mulattoes and mestizoes, all freedmen and freedwomen, and all descendants through either sex of any of these persons." To all these people the first Section above relates. In striving to ascertain the meaning of the Act, words will be taken, as much as possible, in their usual signification, according to grammatical construction, and in such way, the other rules being observed, as will give the greatest force and effect to each and every portion of the Act.

By a resolution adopted by the State Convention assembled in 1865, (Journal of Convention, p. 166,) the Provisional Governor was authorized and directed to appoint two Commissioners "to prepare and report to the next Legislature what laws will be necessary and proper in consequence of the alterations made in the fundamental law, and especially to prepare and submit a code for the regulation of labor and the protection and government of the colored population of the State." In pursuance of this resolution a Commission of well-recognized learning and ability was duly appointed. At the first ensuing meeting of the General Assembly these Commissioners made their report, submitting several Bills, from one of which was framed the Act which we are now considering. The first Section of that Act is of equal brevity and importance, and each word must be regarded as having due and well-weighed significance. The "alteration in the fundamental law" which demanded this remedial Act was the general emancipation of slaves, (Const. 1865, Art. IX, Sec. 11,) whereby an element in the State which had in the main been property had suddenly become a free population. One of the first duties in the minds of these Commissioners and of the Legislature was the establishment of the domestic relations of this people. Of these the one of primary importance is marriage, of which it has well been said, "unlike other contracts, this is one instituted by God himself, and has its foundation in the law of nature. It is the parent, not the child, of civil society." The importance of this relation, both for its moral effect and as a matter of right and of public policy, was fully recognized, and to it is devoted the first Section of the Act. "The

relation of husband and wife amongst persons of color is estab-
lished." It cannot be held that these words created the legal
existence of the marriage relation amongst "persons of color," for
such relation always had existed and been recognized among free
or freed persons of color in this State.—*Bowers* vs. *Newman*, 2
McM., 472; *Hardcastle* vs. *Porcher*, Harper, 495.

"Whatever may be said about public policy, and whatever may
be the future consequences, it is now (in 1841) a settled point that
a free person of color, by the laws of this State, may take and hold,
convey by deed, dispose of by will, or transmit to his heir-at-law,
both real and personal estate."

The same is held in *Hardcastle* vs. *Porcher*. But property cannot
be transmitted to the "heir-at-law" except by the operation of the
Statute of Distributions.—*Wightman* vs. *Valk, et al.*, Dud. Eq., 212.

And it is needless to argue or cite authority to sustain the propo-
sition that the statute is based upon the legal presumption that
legal marriage is the center from which the several lines derive
their source. The right of legal marriage amongst free persons of
color has never been disputed, and it is stated as law by Judge
O'Neall, in his pamphlet styled "The Negro Law of South Caro-
lina," p. 13, § 47, and he cites the cases of *Bowers* vs. *Newman* and
*Hardcastle* vs. *Porcher*. The opinion in *Blakely* vs. *Tisdale* (14
Rich. Eq., 90,) in no wise conflicts. The discussion there of the
above cases has an entirely different bearing. If the Act of 1865
does not create the power of legal marriage amongst "persons of
color," does it confer the right upon individuals (once constituting
a class of those persons) who were not in the enjoyment of the right
at the time the Act was passed? We have already noticed that the
preliminary Act defines "persons of color" to comprehend alike
those negroes, mulattoes and mestizoes who had been free and those
who had been slaves up to the time of emancipation.

It may be argued that the purpose of the Act was to confer upon
the latter class the same right enjoyed by the former. But the an-
swer is that the latter class was already in the full enjoyment of all
legal rights belonging to the former. The act or the fact of eman-
cipation, recognized and confirmed by the State Convention in 1865,
had made the slave a free negro or person of color. The free ne-
groes or persons of color constituted a distinct class in this State;
and when an individual, or a number collectively, was admitted to
that class, the admission subjected the new party to the duties and

obligations, while it entitled him to a full enjoyment of the rights and privileges of the class. Thus, a law which would make all aliens denizens or naturalized citizens, would, without any other word, confer upon all aliens the rights of denizens or citizens, as the case might be.

This State had two classes of native population, commonly known as white persons and colored persons or persons of African blood or the mingled blood. The latter or colored class was subdivided into slave and free. It may be said that the slave was not a person but a chattel. While that is true in the sense of the property, it never was true in the sense in which the matter is now being considered. The slave has ever been, in this State, recognized as a human being and protected by the common law where the same was not altered by the statute or inconsistent with the Constitution, laws and customs of the State.

This proposition is consistent with all the law that is cited in *State* vs. *Fleming*, (3 Strob., 464,) and is fully supported by the dissenting opinions of O'Neall and Richardson, JJ. In the more recent case of *Blakely* vs. *Tisdale* it is thus stated by Wardlaw, A. J.: The status of the negro was that "of a native resident human being of a race deemed inferior; when a slave, subject to the absolute control of a master wherever the latter was not restrained by law, and, when emancipated from the dominion of a master, incapable of testifying, (except upon the trial of one of his own race before an inferior tribunal—*State* vs. *Scott*, 1 Bail., 270; *State* vs. *Davis*, 2 Bail., 558,) of becoming a citizen or of discharging any function which pertained to government, although protected in person, invested with full rights as to the acquisition and holding of property, real and personal, and entitled to sue and be sued in all Courts." Thus is shown the distinct legal division of the race into two classes of human beings, and that the transformation from the one to the other was effected by the fact of emancipation. Therefore when the Act was passed the whole colored race had been, prior to that time, free or emancipated by the State in convention. The right of marriage, and consequently the legality of the relation of husband and wife, *eo instanti*, had existed amongst them with all its legal privileges and obligations. It is clear, then, that the Act, by this Section, conferred upon none the right of marriage *in futuro*.

A third view of the Act is that, whether or not the legality of the relation of husband and wife or the right of marriage already

existed amongst all persons of color, the use of the words "is established." indicates that such was not the view of the Legislature, and that the intention was to create in a prospective sense "new laws" consequent upon the "alterations in the fundamental law," and that this is indicated by the title, "to establish and regulate domestic relations," &c. Upon few words could there be more room for argument than upon the word "establish." It is selected (1 Story on Con., § 454, 3d ed.,) to shew "that it is by no means a correct rule of interpretation to construe the same word in the same sense wherever it occurs in the same instrument. In common language, the same word has various meanings, and the peculiar sense in which it is used in any sentence is to be determined by the context. (Chief Justice Marshall in *The Cherokee Nation* vs. *The State of Georgia.*) A very easy example of this sort will be found in the use of the word 'establish,' which is found in various places in the Constitution." He then proceeds to give some meanings of the word in the several positions which it occupies, as, for example: To settle firmly; to fix unalterably; to make a form and not to fix or settle unalterably or forever; to create; to found and to regulate; to settle, recognize or support; to create; to ratify; and to confirm. We are forced, then, to look to the context and to the law as it was before the passage of the Act to enable us to determine the meaning of a word possessed of such diversity of signification. The relation of husband and wife is of necessity based upon marriage, and the words may, for some purposes, be regarded as synonymous. It being our conclusion that the right of marriage existed amongst persons of color prior to the passage of the Act of 1865, the next step is to consider who were married or who occupied to each other the relation of husband and wife amongst persons of color prior to the passage of the Act. To such persons the Act can have no application. "Marriage with us, so far as the law is concerned, has ever been regarded as a mere civil contract. Our law prescribes no ceremony. It requires nothing but the agreement of the parties, with an intention that *that agreement* 'shall, *per se*, constitute the marriage.'"—Per Johnston, Ch., in circuit decree in *Fryer* vs. *Fryer*, Rich. Eq. Cas., 92.

"Under our laws, marriage is regarded as merely a civil contract, requiring no particular formality, which may be made by a private agreement between the parties."—*Stringfellow* vs. *Scott*, Rich. Eq. Cas., 109, note.

This agreement, like every other contract, is a fact to be proven by evidence generally, by declarations of the parties, cohabitation and repute.—*Fryer* vs. *Fryer; Stringfellow* vs. *Scott, supra; Jewell* vs. *Magood*, Rich. Eq. Cas., 113; *State* vs. *Hilton*, 3 Rich., 434.

The answer, then, is that they were husband and wife at the time of the passage of the Act who had so agreed, or who lived together as such, for that is the very execution of the agreement subsequently to emancipation. We think, therefore, that if the law, as it then already was, be considered, it will be perceived that there could be but few cases to which the Act would apply if applicable only prospectively..

It may be thought, however, that the following Sections strengthen the view that the first Section was meant to create—the right of legal marriage amongst this people—for the second Section enacts that "those who now live as such are declared to be husband and wife;" that the first Section having created the legal right, the second at once applies it, and that the third Section, by indicating an exception, confirms this rule of construction. The reasons already indicated seem to prohibit this interpretation if there be any other more reasonable which the words and the context will justify. For such a construction would make the first and second Sections mere declarations of pre-existing law about which there was no room for doubt and would deprive these Sections of all remedial properties.

It may be said that the remedy is in the fourth Section, which legitimates "every colored child heretofore born." This Section is unquestionably retrospective and applies to the dead as well as the living. It will further be considered at another point; we would only say here that it would be extraordinary to legitimate an entire race, whether born in servitude or in freedom, and at the same time withhold from the parents the right of marriage and fix upon the race the brand of concubinage and upon the offspring the disgrace of bastardy. We think it will be made to appear that such was not the intention of the fourth Section and that it was meant to apply only to those cases which had not come within the provisions of the preceding Sections. Besides, we do not feel at all assured that the children of slaves who were morally married can be deemed bastards. Bastardy is "an unlawful state of birth which disables the bastard from succeeding to an inheritance." Legitimacy, as the word imports, will require that the child be born in a manner approved by law.—Schoulder on Dom. Relations, 304.

There was no law forbidding marriage among slaves, but the intention of slavery made the right of property in the master paramount, and natural marriage could not be allowed to interfere with that power, but was absolutely subject thereto, and could be annulled at will; but that did not make it necessarily, and *ab initio*, a nullity between the parties. Such a view of marriage amongst slaves could not affect the rights of third parties, for it was impossible for any such rights to exist, as slaves could not acquire or hold property in their own right. We are inclined to think that the fourth Section was not enacted upon the assumption that the entire race of slaves was illegitimate; or legitimated by the preceding Sections, where there had been a marriage agreement, but that the Section was meant to apply to cases not provided for by the previous Sections, and thus to effect the legitimation of the entire race which had not been free, nor legally, and but partially morally, responsible for the observance or non-observance of the form and moral law of marriage. That was the mischief which these Sections were meant to remedy. If it had been the intention of the Legislature to create the right of marriage amongst persons of color, the more correct grammatical order of the words in the first Section would have been: " The relation of husband and wife is established amongst persons of color," instead of, as it is written, " The relation, &c., amongst persons of color is established." The latter, which is the Act, grammatically means that something is done to affect a relation which already exists amongst persons of color. Besides, the better language would have been " the relation, &c., *shall exist or shall be permitted.*" To express, then, by additional words, the signification of the grammatical arrangement of the sentence, it may be written: " The relation of husband and wife (heretofore assumed) amongst 'free negroes, mulattoes and mestizoes, freedmen, freedwomen, and all descendants through either sex of any of these persons,' is hereby established." It no doubt will be argued that the Act could not be retrospective and affect the marriages of slaves, because slaves are not included in the definition of " persons of color " in the preliminary Act. A brief investigation will show that while the term persons of color does include the several classes recited in the preliminary Act, it likewise includes persons who were formerly slaves, whether living at the time of emancipation or not; for, as an example, in the Section just recited, "all descendants through either sex of any of these persons " must of necessity

include those who are descended from slaves, members of the colored race, as well as those descended from free negroes, &c. The terms freedmen and freedwomen must be regarded as indicating the class which had been in slavery in contradistinction to previously "free negroes, mulattoes and mestizoes." Besides, the enactment that all such as are therein named "shall be known as persons of color" does not preclude the application of that title to the race of slaves, to which it had been applied from time immemorial. To recur— this is recognized in the Act of 1866, (page 366–29,) "to declare the rights of persons lately known as slaves and as free persons of color. The word 'establish,' as thus used, may be interpreted to signify 'recognized, acknowledged, ratified and confirmed.'" Such signification of the word is supported not only by judicial construction (Story on Con., § , *supra*,) but by common use and in the best authorities. A printed example cited occurs in two verses of the English translation of the Mosaic law concerning a married woman's vow.

"Every vow and every binding oath, to afflict the soul, her husband may establish it or her husband may make it void." But if her husband altogether "hold his peace at her from day to day, then he *establish* all her vows or all her bonds which are upon her; he *confirmeth* them, because he held his peace at her in the day that he heard them."—Numbers, Chap. XXX, verses 13 and 14. In the latter verse the words "establish" and "confirm" are used to translate one and the same word in the Greek and in the Hebrew.

By an identical interpretation of the word in this Act the "relation of husband and wife," which had been assumed, whether legally or not, amongst persons of color, is validated and confirmed.

In arriving at this conclusion, we are strengthened by the case of *Jackson* vs. *Lervey*, 5 Cowen, 397. The Court in that case say: "Sound policy and public morals undoubtedly called the attention of the Legislature to this subject and gave rise to the Act of February 17, 1809. This Act was intended to be retrospective in its operation. By so considering it in the present case, I do not perceive any well-founded objection. It is not relied on here to divest any estate acquired under the law as it was supposed to exist before the passing of the Act. * * * The Act declares all marriages contracted or which may thereafter be contracted, wherein one of the parties was or might be slaves, shall be considered equally 'valid as though the parties thereunto were free, and the child or children

of such marriages shall be legitimate.' Why should it be restricted to cases where the parties were then living? One object was to render the children legitimate. What superior claims had the children of parents then living to the interference of the Legislature to those whose parents were dead when the statute was enacted? I perceive none. The words of the Act are sufficiently broad to include both, and ought so to be construed to effectuate the intent.'

Words more broad than those in the Act of 1865 could not be found. There is nothing to limit the expression in the first Section to " relation of husband and wife " then existing, and everything to shew that the intent was to include the past. To construe it otherwise would make that important portion of the Act a meaningless, or at least needless, enunciation of acknowledged law. And certainly "statutes intending to effect an object of great public utility ought to receive the most liberal and benign interpretation, in accordance with the maxim '*ut res magis valeat quam pereat.*' "—Potter's Dwarris, 203, note 20. It is impossible for such construction to impose hardship or effect mischief, and it affords a great public remedy. It cannot affect property where the rights had vested before the passing of the Act.—*Blakely* vs. *Tisdale*, 14 Rich. Eq., 90. It could only affect those cases of escheat where one of the parties was free before emancipation and capable of holding property, but assumed marriage relation with a slave, in which case, under the law as it stood, the children could not inherit and there might not be any others to inherit the property. But in those cases (as in *Jackson* vs. *Lervey, supra,*) "if, by the statute, the marriage is legalized, the effect of it is that the State cannot resort to the doctrine of escheat. * * * They had the right of disclaiming a forfeiture for want of heirs, and, in my view, they have done so."

Assuming such, then, to be the intent of the first Section of the Act, it is proper to test such interpretation by taking up with it the succeeding Sections. It is well known that the marriage amongst slaves having had no binding legal effect, they were separated by their owners for good cause shown or by sale, especially in the distribution of estates, and that, being thus released or separated and removed from each other, the moral contract between them was regarded as released, and subsequent marriage of the parties to others was allowed and encouraged. In this way a man or woman may have had several wives or husbands all alive and

yet be free from moral blame, for they had a right to regard such separation of persons in their condition as equivalent to a divorce or release—*a vinculo matrimonii*. In such cases, who, under the first Section, would, amongst the living, be husband and wife, for they had all married? The second Section meets the exception and enacts "that those who *now* live as such are declared to be husband and wife." It may be said that this view is subject to the legal objection already stated that those living together since emancipation as husband and wife are husband and wife by force of the law as it stood prior to the Act of 1865, and that this makes the second Section meaningless or needless or puts it in conflict with the first. The answer to that is, that the Legislature has the same power to validate the separations as to validate the marriages, and that persons who come under the provisions of Section 2 are estopped from objecting to the validation of their own acts. Regarding themselves as released *a vinculo*, they married again, as was the custom of those days. If the first Section stood alone, the first marriage might have been held binding and the subsequent illegal. But the second Section validates the last marriage, and thereby validates the separations, and the two Sections operating together settle any doubt that might arise as to the existing relation between persons living at the time of the passing of the Act.

Section 3 applies a remedy for a species of polygamy which existed, fortunately to a limited extent, and, having no relation to the present question, does not require consideration.

Section 4 is, by the force of its words, beyond question retrospective, and by the term "colored child" includes those born during slavery. It would be unjust to the Legislature to entertain for a moment the idea that this Section only applied to those born since emancipation and to the children of those who were free prior to emancipation, and this is conclusive on the point that the term "persons of color" is not limited to the persons specifically mentioned in the preliminary Act. The fact that this Section is retrospective, as already intimated, removes every legal objection that could be advanced to the retrospective application of the first Section. If both Sections are retrospective, as we think, the fourth Section is a sweeping act meant to cover all not specifically provided for by the first Section, and thus to legitimate a race not responsible for its past but charged with its future course. It is meant to apply especially to those cases where there was not the

pretense of marriage, and the connection was in no sense that of husband and wife; and, further, it provides for all cases where the evidence of moral marriage may have been lost. If any other view of the two Sections be taken it would present an arbitrary and unjust enactment, giving to the husband "declared" by Section 2 the power to repudiate the children begotten by him of the woman whom he had regarded as his wife, but who, in that view of the Act, would not be his wife until the Act was passed. From such a construction no possible good could flow, and, perhaps, much mischief, and the purpose of the Act, unquestionably intended to be beneficent, would be disappointed.

The fifth Section is merely directory.

The seventh Section declares what shall be evidence of marriage. This Section can hardly be held to apply to future marriages, for, taken literally, such had always been the law in this State; and unless it is intended that this shall constitute *sufficient* evidence of the fact of marriage under the retrospective provisions of the preceding Acts, it is difficult to perceive its purpose, and this view will be strengthened when we look at the original Bill as presented by the Commission.

It is needless to dwell longer upon the other Sections; it would be merely to show that Sections 12 and 13 are retrospective, but it would be by the same mode of reasoning, and would make unnecessary repetition. While it is not the practice to resort to oral evidence to ascertain the intent of a statute, but resort must be had to the Act itself, in this case we may, with propriety, look to the resolution of the Convention and to the original Bill, as reported by the Commission, and perhaps derive light by comparing the Bill with the Act as adopted.

So much of the Bill as relates to the subject is as follows:

"Section 1. The relation of husband and wife amongst persons of color is established.

"Sec. 2. Cohabitations and reputation, or recognition of the parties, shall be evidence of *its* existence in cases criminal and civil.

"Sec. 3. Those who now live as such are declared to be husband and wife.

"Sec. 4. In case of one man having two or more reputed wives, or one woman two or more reputed husbands, the man shall immediately hereafter select one of his reputed wives and the woman one of her reputed husbands, and the ceremony of marriage between them respectively shall be performed.

"Sec. 5. All children heretofore born are declared to be legitimate."

Section 6 is immaterial.

"Sec. 7. Persons desirous hereafter to become husband and wife *must* have the contract of marriage duly solemnized."

Sections 12 and 13 are the same as in the Act.

It is but proper to say here that the conclusion as to the legal effect of the Act of 1865 had been reached before this original Bill was examined. So far as the Court could ascertain, the report of the Commission is not contained in the Journal or in the reports and resolutions of either branch of the General Assembly, nor could it be found in the public offices. It was handed to the Court on request by one of the Circuit Judges who was at that time Chairman of the Judiciary Committee of the Senate, and is in pamphlet form as originally printed. It is inserted in the opinion because the order in which its Sections occur, as also several words which we italicise, show, perhaps more forcibly than the Act itself, what was the original design, and we think that the Act has in the main not departed from it. The mode of proof is in direct sequence to the first Section, and the fact that this rule of evidence defines what is proof, and applies to the past and not to the future, is, we think, to be inferred from the fourth Section, which is mandatory and compels persons desirous hereafter to become husband and wife to observe the ceremony of due solemnization; and in Section 10 the due solemnization is provided for: "Ministers of the gospel, the District Judge, a Magistrate or any other judicial officer may solemnize marriages."

It is an established rule of construction that where the word "may" is thus used with regard to a public officer it is mandatory, and compels them to perform the duty indicated. It would be singular to command solemnization, and in the same Act weaken this very command by providing that evidence of obedience is unnecessary; and that would be unquestionably the effect if the second Section were held to be other than retrospective and relate to more than is contained in the first Section, to which it is so clearly annexed also by the language used.

It is needless further to discuss this Bill. We do not intend to go into the abstract and deeply interesting questions of law and of natural law, or of right and reason, which the case might suggest. In our judgment the problem has been solved by the statute which

we have been called upon to construe. The power of the Legislature to validate past natural marriages has not been questioned in this case, nor do we deem it questionable. Such legislation is not unconstitutional, for it does not *per se* affect contracts or vested rights and cannot interfere to the injury of others. Our conclusion is not in conflict with the point decided in *Hall* vs. *United States*, (2 Otto, 27,) for the cases are different, and there was no statute to validate the contract. It was held in that case that a contract by a slave with his master was " an utter nullity," and the Court says : " It was an inflexible rule of the law of African slavery, wherever it existed, that the slave was incapable of entering into any contract, not excepting the contract of marriage." That is entirely true. " By the law of African slavery," with us, the slave was incapable of entering into the contract of marriage—in the accepted legal sense of the term—while he was a slave, but when he was emancipated (during the existence of slavery as an institution) he at once became capable to contract. The point is, that the incapacity to marry was not *in re*, but *per lege*. It may be said that there was no *law* forbidding marriage, but that the slave was, nevertheless, adjudged to be incapable and that the incapacity was, therefore, in the slave. It is true there was no statute, but slavery is in itself a law which establishes the dominion of the master and forbids whatever conflicts with the right of property which is in him, and by that law the marriage among slaves was deprived of all legal force. The slave, however, although property, was also a human being and a reasonable creature.—*Blakely* vs. *Tisdale*, *supra; State* vs. *Porey*, 4 Strob., 166. His capacity to form a natural marriage is thus admitted. His capacity to enter into a civil marriage upon the removal of the disability of slavery, or in his original condition as a free African, is admitted in *Hardcastle* vs. *Porcher*, *supra*, and *Bowers* vs. *Newman*, *supra*. The power of the State to remove disabilities which its own power had imposed, and of the Legislature to validate Acts which at the time, by reason of then existing laws, were null and void, is well recognized. Indeed, it is difficult to perceive real difference in principle, so far as the legislative power is concerned, between the Act of 1865 validating marriages entered into by slaves during slavery—slavery having, prior to the Act of 1865, been abolished by the Constitution of the State—between that Act and the Act of the Legislature in Connecticut validating marriages which by law were null and void *ab*

*initio.*—Cited in Cooley on Con. Lim., 372, and Sedgwick on Stat. and Con. Law, 666. In the opinion sustaining the Act, Hosmer, J., says, in *Goshen* vs. *Stonington,* 4 Conn., 224: "The man and the woman were unmarried, notwithstanding the formal ceremony which passed between them, and free, in point of law, to live in celibacy or contract marriage with any other person at pleasure. It is a strong exercise of power to compel two persons to marry without their consent and a palpable perversion of *strict* legal right. At the same time the retrospective law thus far operating on vested rights is admitted to be unquestionably valid, because manifestly just." It may be said that the difference is, that in the Connecticut and other similar cases the parties had a legal right to contract, but failed to execute the contract in the manner prescribed by law. Put it in the other form: The parties were able to contract, but were forbidden by law to contract unless they procured the aid and authority of a certain class of functionaries designated by the law. The contract could not be executed until this inhibition was removed, not by any voluntary act of the parties, but by the exercise of power on the part of the person authorized by law. If he had refused there could not be marriage. The slave was a person; the exercise of his power to marry was inhibited by the fact of slavery. This impediment could at one time be removed at the pleasure of the master—subsequently by the power of the State; and when thus freed—when the power had been exercised by the authority which could act that part—he could execute the contract; or if he had attempted the contract before his disability had been removed, his act might be validated by the Legislature. The Legislature, even while the person was a slave, could enable him to marry, (Maryland Act, 17; *Jones* vs. *Jones,* 36 Maryland,) or could validate past marriages so far as it did not conflict with the rights of the master.

It is contended, however, that the Act of 1865, whatever might have been its intent or effect, was repealed by the Acts of 1866 (13 Stat., 366–29,) and of 1872. (Rev. Stat., pp. 768 and 842.) The Act of 1866 confers some rights upon persons of color, and repeals all Acts inconsistent therewith or contrary thereto, but it certainly does not attempt in any wise to contract their rights or to deprive them of any which had been conferred by the Act of 1865. There are parts of the Act of 1865 which are repealed by the Act of 1866, but not the first Section, nor the fourth nor the seventh.

As to the Act of 1872, (Rev. Stat., pp. 768 and 842,) the repeal thereby is qualified. Sec. 4, p. 766: "It shall not affect any act done or right accruing, accrued or established    *    *    before the repeal takes effect." By our view of the Act of 1865, the marriage between slaves and the legitimation of all children born of slaves are things clearly "established" by the Act, and constitute vested rights which cannot be taken away; but the special proviso in the repealing clause renders decision upon the constitutionality or the validity of an absolute repeal unnecessary.

It is hardly necessary, after what we have said, to do more than refer to the Act of March 12th, 1872, (Vol. —, p. 183,) were it not for some ambiguity in the language of the Act. The Act may have been passed under the impression that the provisions on the subject to which it relates in the Act of 1865 had been repealed; but, however that may be, there is no conflict between the Acts, and the repealing clause in the Act of 1872 cannot affect the Act of 1865. The first Section of the Act of 1872 is confined to such persons as, at the time of the passage of the Act, were cohabiting as husband and wife or recognizing the relation "as still existing at the time of the passage of this Act." Section 2 then begins: "And all of *their* children shall be deemed legitimate, whether born before or after the passage of this Act." So much of the second Section properly belongs to the first Section, and is in no wise connected with the succeeding portion of the sentence, which is as follows: "And when the *parties* have ceased to cohabit before the passage of this Act, in consequence of the death of the woman, *or from other cause*, all of the children of the woman, recognized by the man to be his, shall be deemed legitimate." The entire Act relates to "all persons in the State of South Carolina who previous to their actual emancipation had undertaken and agreed to occupy to each other the relation of husband and wife." The first Section disposes of those who "are cohabiting as such," (husband and wife,) "or in any way recognizing the relation as still existing at the time of the passage of this Act." And the first portion of the second Section disposes of "*their* children." The balance of the second Section applies to "the parties" who "have ceased to cohabit before the passage of this Act." It is obvious that "the parties" cannot refer to the preceding word "their," which relates to the class to which the first Section applies; but "the parties" represents the second division of those who "previous to their actual emancipation had

undertaken and agreed to occupy the relation to each other of husband and wife." The Act does not proceed to make this latter class husband and wife, but legitimates all the children of the woman recognized by the man to be his. Thus all cases are embraced in which the children of such a couple were ever recognized by the man, the only other condition essential being that the pair should once have undertaken the relation of husband and wife and then ceased to cohabit. It is true that the Act does specify one particular cause for the cessation of cohabitation, viz., the death of the woman, but it adds " or from other cause." Thus the death of the man—or the death of both—effects the same end and the child is legitimated. The time of recognition by the man is not qualified, and is good if proved to have been made at any time during slavery as well as since. It is admitted in the case before us that the persons named as living in the relation of husband and wife were the parents of the petitioner and the deceased, and that would be deemed sufficient proof of recognition under the Act of 1872, which proceeds on that proof, and on proof of the death of the father and mother, to declare these two children legitimate and capable of inheriting from each other. It is concluded that the petitioner, Katie, and the deceased were brother and sister of the whole blood, being the legitimate children of Joe and Nancy, and that, as such relation, the petitioner is entitled under the Statute of Distributions.

The fifth and sixth grounds of appeal relate to the jurisdiction of the Court of Probate in cases of partition of real estate. If that Court has no jurisdiction in cases for the partition of real estate, then all its proceedings in relation thereto were null and void and should be so declared.

Where nothing appears on the face of the proceedings to show a want of jurisdiction, and the objection is not made in the Court below, it cannot be taken in the Court of Appeals.—*Varney* vs. *Vosch*, 3 Hill, 237. But, as was held in *Hill* vs. *Robertson*, (1 Strob., 1,) "the proceedings of a Court of limited jurisdiction in a case clearly without its jurisdiction are absolutely void, and may be so declared whenever the question is presented, whether directly or collaterally." Neither can failure to take objections at the proper time nor consent give jurisdiction, (*Gallman* vs. *Gallman*, 5 Strob., 207,) except in cases where, under certain circumstances, the Court might take jurisdiction.—*Miller* vs. *Ferne*, Bail. Eq., 181. Where the case is such that under no circumstances

could it be brought within the jurisdiction, then objection may be made at any stage of the proceedings.

As was said by Moses, C. J., in *Walker* vs. *Cresswell*, 4 S. C., 356: "We have no hesitation in saying that where there appears to be a clear want of jurisdiction, the Court is not prevented from so declaring because the exception is not made by the party against whom it is to operate." And again: "When a Court takes cognizance of cases in which the very nature of its organization prevents it from entertaining the issues made between the parties, and its means of administration prevent an enforcement of any judgment it may therein pronounce, the objection to its jurisdiction may be made at any time." The objection, therefore, in this case, although it should properly have been made in the Circuit Court, has not come too late, if, as contended, the Probate Court has no jurisdiction in a case for the partition of real estate, and the question must, therefore, be considered.

The Act of the Legislature (§ 41 Rev. Stat., 573,) does undertake to confer such jurisdiction, but the Court concurs in the views expressed by Moses, C. J., in his separate opinion in *McNamee* vs. *Waterbury*, (4 S. C., 167–8,) that to determine the limits of the jurisdiction of the Court of Probate we must look to the Constitution, by which instrument jurisdiction is conferred. In this respect the Constitution of 1868 differs widely from that of 1790. By the latter the judicial power of the State was "vested in such superior and inferior Courts of law and equity as the Legislature shall from time to time direct and establish," and it was left to the Legislature to distribute the judicial powers amongst the several Courts so established; while by the former (the Constitution of 1868) the judicial power is vested in the several Courts named and in such municipal and other inferior Courts as the General Assembly may deem necessary, but the jurisdiction of each of those named, among them the Court of Probate, is defined and specified.

The jurisdiction thus defined and specified by the Constitution can be neither enlarged nor diminished by the legislative power of the State, which is itself the creature of the Constitution, and controlled by the provisions of that instrument, which constitutes the fundamental law.

Looking to the Constitution, then, for the limits of the jurisdiction of the Court of Probate, we find those limits defined in Section 20, Article IV, and, as there defined, cases for the partition of real estate are not embraced.

The Court of Probate is unquestionably a Court of inferior and limited jurisdiction. When the exercise of any power is claimed for a Court of that character, it must be shown to exist by express grant or to be necessarily consequent upon some power clearly given. The power here exercised by the Court of Probate is not expressly granted in the Constitution, nor is it necessarily consequent upon any power which is given. The conclusion follows that the power does not exist. It is possible that, had the decree of the Court of Probate been final in its nature, its adoption by the Circuit Court might have operated as a decree or judgment of that Court, which unquestionably has jurisdiction in partition of real estate. But such is not the case, and the decision of the Circuit Court, while it affirms the decision of the Probate Court, remands the case for further proceedings in that Court. The judgment of the Circuit Court, therefore, failed to cure the defect of lack of jurisdiction, and neither judgment can stand.

It is unnecessary to consider the remaining grounds of appeal, as they are in effect disposed of by the conclusion on the question of jurisdiction.

The judgment of the Circuit Court is reversed and the case remanded, with instructions that the proceedings in the Court of Probate be dismissed so far as *they* relate to partition of real estate.

*Willard*, C. J., concurred.

McIVER, A. J., dissenting. Being unable to assent to all of the conclusions reached by a majority of the Court, I desire to indicate, briefly, some of the grounds upon which I rest my dissent, without elaborating the argument in support of such grounds.

The question which lies at the foundation of the whole case is whether the connection which existed between Joe and Nancy was that of a lawful marriage, so that their issue, Katie and Willis, can be regarded as legitimate. It is to be observed that the question is not whether such connection was unlawful in the sense that it violated any law, by which the parties would be subjected to punishment, but whether such connection can be regarded as lawful in the sense that it gave rise to the relation of husband and wife, with the consequences flowing therefrom—the legitimation of their issue. These persons having been born slaves, and continued as such until their death, it is conceded, were incapable of forming

a lawful marriage connection in the sense above stated, and hence their issue must necessarily have been, at one time, illegitimate, for Blackstone tells us that a bastard is one born "out of lawful matrimony." This being the case, such issue must be regarded as still illegitimate unless they have been by proper authority declared legitimate. The burden of proof is upon the respondents to show this; and they have attempted to show it by the Act of 1865, (13 Stat., 31,) entitled "An Act to establish and regulate the domestic relations of persons of color," &c. The first question to be considered is: To what class of persons does this Act apply? Does it apply to the class to which Joe and Nancy belonged during their lifetime, they having died many years before the slaves in this State were emancipated, and, consequently, many years before the passage of the Act in question? The title informs us that, so far as the portion of it with which we are concerned, it applies alone to "persons of color," and the preceding Act, entitled "An Act preliminary to the legislation induced by the emancipation of slaves," (13 Stat., 10,) declares who shall be embraced within the words "persons of color," viz.: "All free negroes, mulattoes and mestizoes, all freedmen and freedwomen, and all descendants, through either sex, of any of these persons."

Now, Joe and Nancy, having died while still slaves, cannot by any possibility be brought within either of these classes, and cannot, therefore, be regarded as "persons of color" referred to in the Act of 1865, and hence the first Section of that Act cannot be applied to them, and the connection which existed between them cannot be regarded as constituting the relation of husband and wife. If they had lived until the slaves in this State were emancipated, then immediately they would, by virtue of that fact. have been placed in the class of "freedmen and freedwomen," and the Act would have applied to them, thereby legalizing their connection and giving rise to the relation of husband and wife between them. The Act cannot be construed as applying to slaves as such, but may be to persons who were once slaves, but who had subsequently, and prior to the passage of the Act, been placed in a different and higher class—that of freedmen; and as the persons in question never reached that class, the Act cannot apply to them. I must conclude, therefore, that Joe and Nancy could not be regarded as sustaining towards each other the relation of husband and wife, and that, therefore, their issue, Katie and Willis, were illegitimate and incapable of inheriting the one from the other.

It may be contended, however, that, even if this be so, the rights of legitimacy are, nevertheless, conferred upon Katie and Willis by the express terms of the fourth Section of the Act. That Section reads as follows: "Every *colored* child heretofore born is declared to be the legitimate child of his mother, and also of his colored father, if he is acknowledged by such father." If this language is to be construed as conferring the rights of legitimacy upon Katie and Willis, who were born of slave parents who never became freedmen, long before the emancipation of the slaves, then it necessarily follows that the same rights were conferred upon all the offspring of slaves in every preceding generation of persons of that class. This construction would not only be wholly unnecessary, but would lead to inextricable confusion. When we remember, as we have seen above, that the Act was not intended to apply to slaves, but only to "persons of color,"—by whom the Legislature has taken the pains to declare that they meant persons other than slaves—it is obvious that such a construction of the Act is inadmissible. It is true that the word "heretofore" in the Section does seem to demand that the Act should have, in violation of the general rules, a retrospective operation, but the inquiry still remains whether it may not be given such retrospective operation without extending it so far as to embrace the children of slaves born in any preceding generation, especially when by so extending it persons of a class not intended to be embraced within the terms of the Act are included. This Act was passed on the 21st day of December, 1865, and as the slaves in this State had been emancipated in the previous Spring, (*Pickett* vs. *Wilkins*, 13 Rich. Eq., 366,) there were doubtless quite a number of colored children born in this State between those two dates. Such children would be embraced within the terms "every *colored* child" used in the Act of 1865, as they would be *descendants* of *freedmen* and *freedwomen*, that is, descendants of some of those persons named in the "Act preliminary to the legislation induced by the emancipation of slaves," as coming with the terms "persons of color," to which class of persons the Act in question is confined. It may be, too, that by a liberal construction, which I am disposed to give the Act, that the terms "every colored child" would also embrace *all* the children of persons who, though once slaves, *had become freedmen*, whether born before or after the actual emancipation of the slaves, as they too would be the descendants of freedmen and freedwomen; but how those terms can be

held to embrace the children of those who *never became freedmen*, I am unable to understand.   It is also to be observed that the language of the fourth Section of the Act under consideration is, " if he *is* acknowledged by such father," not if he *has been* or *is* acknowledged, and this is another indication to my mind that the Act only intended to deal with and provide for the *then existing* condition of things, and not to extend back through all preceding generations.   It seems to me that so to extend the Act would lead to inextricable confusion.

Suppose, as not unfrequently happened during the existence of slavery, that Joe had at some time of his life, either prior or subsequent to his connection with Nancy, lived in the same way with some other woman by whom he had begotten two other children,— which set of children are to be regarded as legitimate?   Why one set any more than the other?   We know as matter of history that many of the slaves in this State were brought here from Virginia, and also that many slaves were carried from this State to the West. Now, suppose a case shall hereafter arise in which it is made to appear that the ancestor through whom the claimants before the Court trace their relationship had lived with some woman in Virginia, in the same way that Joe lived with Nancy, by whom he had a child whom he always acknowledged as such, and that when brought to this State his connection with such woman was broken up, and he formed another similar connection with some other woman in this State by whom he had another child who was also acknowledged by him as such, and then suppose he had been sold in the West by which his second connection was broken up, whereupon he found a third similar connection with still another woman in the West by whom he had still another child who was also acknowledged by him as such,—which of these children could we hold to be legitimate?   Certainly not all of them without sanctioning polygamy, which, by our law, is a crime.

It seems to me also that there is great force in the argument that the Act of 1865, as well as that of 1872, referred to in the argument, are in conflict with Section 39 of Article I of the Constitution of 1868, and are, therefore, null and void.   So much of that Section as relates to this matter reads as follows: " Distinction on account of race or color, in any case whatever, shall be prohibited, and all classes of citizens shall enjoy equally all common, public, legal and political privileges."   Every one will admit that one of

the main objects of the present Constitution was to place the two races upon precisely the same footing, so far as the law could do so, both in respect to civil and political rights. One was to enjoy no privileges denied to the other, and to be subjected to no burdens to which the other was not liable. Hence, it would seem to follow that any legislation which should confer upon the members of the one race any privileges whatsoever which were not at the same time conferred upon the other would be in violation of this clause of the Constitution, just as much as any legislation which should impose upon the one race burdens from which the other was exempt. Such legislation as that under consideration must be regarded as an attempt to make a "distinction on account of race or color ; one *race by reason of its race or color* is to enjoy certain privileges, while the other, only because it is not of the same race and color, is not to be entitled to such privileges. For it is very manifest that both the Act of 1865 and that of 1872 do undertake to confer certain rights and privileges upon the members of the colored race, while the same rights and privileges are not conferred upon the members of the white race. The rights of legitimacy are sought to be conferred upon a certain class of colored children, while the white children who have been born from the same kind of connection, under the same circumstances, have no such rights conferred upon them. If this is not a distinction on account of, that is by reason of, race and color, I confess that I am unable to understand the meaning of the terms.

The colored race, under the Constitution of this State, are entitled to the *same*, not *greater*, civil and political rights as the white race, and in these rights, *no less* and *no more*, should the Courts protect them. It will not do to say that the right of legitimacy is a vested right, and, having been once conferred, could not afterwards be taken away. For while this argument may be sufficient to show that the Act of 1866, (13 Stat., 393,) which was doubtless designed to repeal the Act of 1865, could not have that effect so as to defeat or divest such vested right, it would not be sufficient to show that such a vested right would be beyond the reach of a constitutional provision unless it could be shown that such vested right vested upon or grew out of a contract, and could thereby be brought under the protection of that provision of the Constitution of the United States which forbids a State from making any law, either by legislative enactment or constitutional provision, which shall impair the

obligation of a contract. Nor will it do to say, as was said in argument, that the Act of 1872 (15 Stat., 183,) applies to "all persons," and therefore there is no distinction on account of race or color. There might be great force in this argument if the words quoted described fully the persons to whom the Act refers, but such is not the fact. The persons to whom the Act refers are "all persons in the State of South Carolina who, previous to *their actual emancipation, &c.*," clearly confining the Act to persons who had once been slaves, and, as the colored race alone occupied that position, confining the Act to that race.

I concur entirely in the conclusion which the majority of the Court reached upon the question of jurisdiction, and deem it altogether unnecessary to say anything upon that question.