No. 4757.

AUGUSTE AND JOSEPH PIERRE *v.* AUGUSTE FONTENETTE et als.

|25|617|
|117|971|

Emancipation gave to the slave his civil rights, and a contract of marriage, legal and valid by the consent of the master and moral assent of the slave, although dormant during the slavery of the parties, produced, from the moment of their freedom, all the effects which result from such contract among free persons.

But the marriage which was to produce these civil results must have existed at the time the emancipation took place. If the marriage was dissolved before emancipation, the parties' rights were no longer dormant; they were dead; and the subsequent emancipation, as it could not resuscitate the marriage, could produce none of the civil fruits which are the results of a civil marriage.

APPEAL from the Probate Court, parish of St. Martin. *Fournet, J. DeBlanc & Perry,* for plaintiffs and appellants. *Felix Voorhies* and *E. Simon,* for defendants and appellees.

MORGAN, J. Magdeline Vincent, by what purports to be a nuncupative testament by public act, instituted Auguste Fontenette her universal legatee. Auguste and Joseph Pierre allege that they are the nephews of Magdeline Vincent. They ask to be recognized as her heirs, and that her will be declared a nullity. The exception is, that plaintiffs are not the legitimate issue of Magdeline Vincent's brother, through whom they claim, and can not, therefore, attack the will.

The plaintiffs and the testatrix were born slaves. Magdeline Vincent's husband died a slave, and so did the mother of these plaintiffs. Their father purchased his freedom. Both their father and mother died before the war.

Plaintiffs claim that their father and mother having been married according to the forms prescribed by the law in regard to persons of their class, their subsequent emancipation gives to the marriage of their parents a civil effect which it would not otherwise have had, and confers upon them the title of legitimacy, and the consequent right of inheritance. It is established that their father and mother lived together as husband and wife, with the consent of their masters.

By the law as it was at the time when slavery existed, slaves could make no contract, except with reference to their freedom. They could not marry, except with the consent of their masters, and their marriage produced none of the civil effects which result from such a contract. They could transmit nothing by succession or otherwise, except that what they might have inherited from free persons, had they been free, might pass through them to such of their descendants as might have acquired their liberty before the inheritance fell to them. C. C. 174, 176, 182.

Marriage is a civil contract; legitimation is the result of that contract; the right of inheritance is also the result of it. These are the civil effects of the contract.

It has been held that emancipation gives to the slave his civil rights,

and that a contract of marriage, legal and valid by the consent of the master and moral assent of the slave, from the moment of freedom, although dormant during the slavery, produces all the effects which result from such contract among free persons. Girod *v.* Wells, 6 Martin, 559. This doctrine we do not deny or controvert. But we think that the marriage which is to produce these civil results must exist at the time the emancipation takes place. In this case the marriage was dissolved before emancipation. The parties' rights, therefore, were not dormant; they were dead; and the subsequent emancipation, as it could not resuscitate the marriage, could produce none of the civil fruits which are the results of a civil marriage.

The legitimation, then, of these plaintiffs became impossible as a result of marriage, by the death of one of their ancestors. They can not, therefore, claim to be legitimate heirs; and as it is only by reason of their possessing this status that they can attack Magdeline Vincent's will, it follows that the exception taken against them was properly maintained, and the judgment must be affirmed.

Judgment affirmed.

---

TALIAFERRO, J., *dissenting.* The plaintiffs, claiming to be the legal heirs of one Magdeline Vincent, bring this suit against Auguste Fontenette, to recover the succession of Magdeline in his possession, the ownership of which he claims as universal legatee under her act of last will, duly probated and ordered to be executed. The plaintiffs seek in this action to have the will of Magdeline annulled and to be recognized as her legal heirs. The defendant, by exception, denies that the plaintiffs are the legal heirs of Magdeline Vincent; that they have any right to her succession; and, having no interest in setting aside her last will and testament, they have no cause of action.

The exception was sustained, judgment rendered in favor of the defendant, and the suit dismissed.

The pretensions of these plaintiffs are resisted on the ground that by the laws that existed in Louisiana prior to emancipation they were incapable of inheriting property; that no legal marriage did or could take place between their parents, and therefore they were not legitimate heirs, and were incapable of being legitimated.

A solution of the question presented must be sought for in the proper construction to be given to the one hundred and eighty-second article of the Code of 1825, interpreted in reference to the changed condition of the plaintiffs by emancipation.

The father of these plaintiffs was a slave, who acquired his freedom and died before the abolishment of slavery in this country, possessed of a small amount of property. Their mother died a slave; her death

preceding that of the father. Magdeline Vincent was the sister of Pierre, the father of the plaintiffs. She, it appears, originally a slave, had during the existence of slavery become free, and at the death of Pierre succeeded as heir to his small succession. She died in 1869, leaving a will, by which she constituted Auguste Fontenette her universal legatee. The status of the plaintiffs was that of slaves up to the time of the general emancipation.

Magdeline Vincent, as we have seen, had become free previous to the general emancipation, and by that event Auguste and Joseph Pierre acquired the status of free persons. This was their condition at the time of the decease of Magdeline in 1869. They were, therefore, capable of inheriting from her, unless there existed at that time some legal disability other than that which previously existed on account of their being slaves. The question of their legitimacy is the principal one to be determined.

The cohabitation, by their own consent and by the permission of their master, of a man and woman who were slaves, was termed by the one hundred and eighty-second article of the Code of 1825 a marriage. The words of that article are : " Slaves can not marry without the consent of their masters, and their marriages do not produce any of the civil effects which result from such contract."

A marriage thus entered into possessed all the efficacy which could have been imparted to it had it been accompanied with more ceremonies and formalities. The interposition of a priest or minister of the Gospel to pronounce the formulas of uniting persons in wedlock could have conferred upon slaves entering into that state no greater rights or privileges. It would seem, then, that the objection opposed to these plaintiffs, that their parents were not married according to law, is not well taken, inasmuch as in their case all the requisites necessary to constitute marriage were complied with. The sense in which we are to understand the provisions of article one hundred and eighty-two of the Code of 1825, would seem to be that the marriages of slaves do not, during the condition of the parties as slaves, produce any of the civil effects which result from such contract. In other words, that the civil rights resulting from the marriage of slaves were, during the period they occupied that status, dormant and inoperative; but on passing out of that status into the opposite one of freedom, those rights revived and became effective.

In the case of Girod v. Wells, 6 Martin's Reports, page 559, it was announced by Judge Matthews, the organ of the court, that "it is clear that slaves have no legal capacity to assent to any contract. With the consent of their masters they may marry, and their moral power to agree to such a contract or connection as that of marriage can not be doubted; but whilst in a state of slavery it can not produce

any civil effect, because slaves are deprived of all civil rights. Emancipation gives to the slave his civil rights, and a contract of marriage, legal and valid by the consent of the master and moral assent of the slave, from the moment of freedom, although dormant during the slavery, produces all the effects which result from such contract among free persons."

It is clearly shown that the father and mother of the plaintiffs lived together on the plantation of their former owner as man and wife, according to the general custom of slaves at that period; that they were so recognized by their master and by their acquaintances, white and black, in the neighborhood; that Pierre and Magdeline were reputed brother and sister, and as between themselves they recognized that relation. It is likewise shown that the plaintiffs were recognized by their owner and generally by others acquainted with them as the children of Pierre and his wife, their mother. It is shown that the general custom among the slave population in the matter of marriage was to obtain the consent of the master and mistress, and live together in the relation to each other of husband and wife. The formality of a marriage ceremony by a priest or other person authorized to solemnize marriage was sometimes resorted to, but this was by no means a general usage. In the great majority of cases the simple agreement of the parties themselves to form the relation of husband and wife, followed by the consent of the master or of the master and mistress, constituted marriage among the slave population of the State.

Article 182 of the Civil Code of 1825 declared that "slaves can not marry without the consent of their masters, and their marriages do not produce any of the civil effects which result from such contract." A solution of the question presented must be sought for in the proper construction to be given to this article of the Code, interpreted in reference to the changed condition of the parties by emancipation.

The plaintiffs' parents were married in the manner the law permitted marriages to take place between persons in their condition of life. The civil rights resulting from marriage between white people did not accrue from their marriage at the time it took place because these rights, from motives of policy then existing, were withheld. Afterwards, when the motives which prompted the prohibition ceased, the disabilities ceased also. *Cessante ratione cessat et ipsa lex.* During the state of slavery the rights and benefits arising from marriage were, in their case, suspended. At the termination of slavery these rights and advantages were developed and took effect. They accrued to the benefit of the heirs who, by the general emancipation, became free, although their parents did not survive the period of slavery. The heirs became legitimated and capacitated to receive. They inherit from Magdeline Vincent, through their father, whose succession was

taken by her, the acknowledged sister of Pierre, and who acknowledged his children as her nephews. Civil Code of 1825, articles 176 and 945.

But it is urged that by the statute of 1868 (No. 210, page —, of Statutes of 1868) provision was made for persons of this unfortunate class, enabling them to legalize private or religious marriages upon complying with certain formalities within two years from the passage of the act; and that the enactment of this statute shows that it was never the intention of the Legislature to sanction a marriage entered into merely by the consent of the master and not followed out and perfected by a solemnization of some sort. This act, I conceive, came in aid of persons whose cohabitation had never been sanctioned by any proceeding which the law recognizes as marriage. It applied to all persons whether free or bond, white or black. Besides, it is not for the Legislature to divest rights acquired from any form of marriage recognized by law.