By the Court.
It is well settled that the validity of a marriage must be determined from the lex loei contractus. If valid where solemnized, it is valid elsewhere; if invalid there, it is invalid everywhere. Story’s Confl. L. §§ 84, 93; Bishop’s Mar. & D. § 390 ; Bar’s Int. L. (S. & B.’s ed.) 364. It will be seen tfiat exceptions to the rule exist, and how far they apply in cases of this sort is discussed in Harris v. Cooper, 31 U. C. Q. B. 182. It appears in Davenport v. Caldwell, 10 South Car. 317, a copy of the report of which case is made part of the recox’d, that the law of South Carolina, previous to the emancipation proclamation, with respect to slave marriages, *561 was substantially the same as in all the states in which slaves were then held. We are disposed to view those marriages in the most favorable light which the law will warrant; but it is impossible to escape the conviction that, previous to emancipation, they were marriages of imperfect obligation. “It was,” said Swayne, J. in Hall v. United States, 92 U. S. 27, 30, “ an inflexible rule of African slavery, wherever it existed, that the slave was incapable of entering into any contract, not excepting the contract of marriage.” Mr. Bishop thinks there is a stronger reason for the invalidity of such marriages than inability to contract. He says : “ That the duties of husband and wife are incompatible with those of a slave, is a proposition evidently sound in law, and upon it the doctrine which denies to slavery the power of matrimony may well rest.” 1 Bishop’s Mar. & D. § 158. But although such marriages were of imperfect obligation, we are unwilling to say they were mere nullities. They were indeed not only countenanced, but, for most cogent reasons, encouraged by both white and colored, at the places where they were solemnized. A marriage celebrated during insanity of the parties, or where they were too young to give consent, or where impotence existed, is ratified by cohabitation subsequent to the removal of the disability ; a contract of marriage obtained by fraud, becomes unimpeachable by cohabitation after the fraud is discovered ; and a slave marriage becomes entirely valid by cohabitation subsequent to emancipation. But in all these cases whore there was no such ratification, the marriage might be avoided in some form. This is well illustrated by Shafher v. State, 20 Ohio, 1. That was an indictment against Shafher for bigamy. He married Elizabeth Emerich, March 19, 1848, when he wras less than sixteen years old; and while she was still living, on March 19,1850, he married Amanda Fitz, when he was less than eighteen years of age. The statute then in force fixed the ages at which persons might marry at eighteen in males and fourteen in females. The court hold that the first marriage was completely avoided by the second marriage, and hence, on that state of facts, Shafher was not liable to proseciition. Although that decision is not in all respects in accord with two or three other cases (1 Bishop Mar. & D. § *562 143 et seq.), it will be seen that this conflict in no way militates against Shafheps case as a pertinent illustration of the principle stated.
A case more directly in point is Harris v. Cooper, supra, which was fully argued and carefully considered in the Queen’s Bench, Upper Canada, in 1871. It appeared that in 1825 John Harris and Sarah Halloway, both slaves, living in Richmond, Virginia, were, with the consent of their masters, married by a minister of the gospel in the usual form of marriages in that state. They lived together until 1832, during which time there was issue of the marriage three children, one of whom still lives. In 1832, Harris escaped from slavery, changed his name to George Johnson, and became a resident of New York, whore in 1833 he was married in due form of law to a colored woman also named Sarah, and they cohabited together as husband and wife. In 1834 he became a citizen of Canada, and having accumulated property, died there in 1851. His wife by the slave marriage died in Richmond. The son by the slave marriage brought suit in Canada to recover the real estate in Canada, of which his father died seized, but it was held that he could not recover, and among other things it was said, that the first marriage, having been completely abandoned, was wholly invalid.
Mr. Bishop, in the last (6th) edition of his work on Marriage'and Divorce (vol. 1, § 163), states the law to be as follows: “According to usage, in all places where slavery existed in this country, the marriages between slaves were dissolvable without judicial sentence, wherever the parties were permanently separated. A separation at or before emancipation, therefore, would properly be deemed a divorce. For if the law takes cognizance of slave marriages, it must also of these slave divorces.” And see Pierre v. Fontenette, 25 La. Ann. 617; Washington v. Washington, 67 Ala. 281; Long v. Barnes, 87 N. C. 329.
We are not required to go to that extent in this case. Indeed, if Peter Dunlap had not disaffirmed the slave marriage by his marriage in Canada, we are by no means prepared to say that Maria McDowell would not bo entitled to the property by force of the slave marriage, the disability to which mar *563 riage was removed by emancipation. But we have no such case before us. Peter Dunlap did marry in Canada, in 1856, according to the laws in force there, and did not thereby commit the crime of bigamy, but performed an act perfectly lawful, and effectually avoided the slave marriage. He lived with the wife lie married in Canada twenty-one years, and until she died. They accumulated property amounting to $10,000, and raised a family of three daughters, now young women. ' There is no doubt that father, mother and daughters regarded the marriage as in all respects valid, and so the law regards it.However much our sympathy may be with the plaintiff, whose unfortunate condition was that of servitude, our duty is simply to declare the law. We have not been able to find a single case, nor do we believe one can be found, which would support us in saying that this property shall be wrested from the daughters of Peter and Rachel Dunlap. '

Judgment affirmed.