(42 South. 470.)

No. 16,241.

JOHNSON'S HEIRS v. RAPHAEL.

In re RAPHAEL.

(Nov. 26, 1906.)

1. MARRIAGE — PRIVATE AGREEMENT — VALIDITY.

Marriages by private agreement, express or implied, have never been recognized by the laws of Louisiana, which, on the contrary, have always required that a contract of marriage shall be celebrated by a priest, minister, or some duly authorized public officer, in the presence of three witnesses.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Marriage, §§ 12–14.]

2. SAME—SLAVES—VALIDITY.

While the Civil Code of 1825 inferentially permitted the marriage of slaves, with the consent of their masters, it did not dispense with the celebration of nuptials in such cases.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Marriage, § 7.]

3. SAME—PRIVATE AGREEMENT—VALIDATION.

Act 1868, No. 210, p. 278, recognized the nullity of marriages by private agreement, whether express or implied, from cohabitation as man and wife, by providing for their validation, conditioned on the authentic acknowledgment of the marriage relation by the parties in interest.

4. SAME—SLAVE MARRIAGES—RATIFICATION.

Slave marriages, while binding in morals, produced no civil effects until ratified by continued cohabitation after emancipation or by acknowledgment as required by the act of 1868, supra.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Marriage, §§ 97, 108.]

5. SAME.

Where a negro man and woman "took up with each other" during the time of slavery, without any celebration whatever of their union, the consent of their master to the continuance of their irregular relations did not have the effect of creating a marriage.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Marriage, § 7.]

6. SAME.

Where the same parties never lived together after April, 1864, and after the close of the Civil War in 1865 both of them were lawfully married to other persons, their irregular union in 1851 did not have the legal effect of legitimating their slave children.

(Syllabus by the Court.)

Action by the heirs of William Johnson against Onezime Raphael. Judgment for defendant was reversed by the Court of Appeal, and he applies for certiorari or writ of review. Judgment of Court of Appeal reversed and district court affirmed.

Scarborough & Carver, for applicant. Breazeale & Breazeale, for respondents.

LAND, J. This is a petitory action instituted in January, 1906, to recover 60 arpents of land situated in the parish of Natchitoches. Both parties claim title under William

JOHNSON'S HEIRS v. RAPHAEL.

Johnson, who died in the year 1894. Plaintiffs allege that they are children of William Johnson and Elizabeth Johnson, negro slaves, who contracted marriage and lived together as man and wife, with the consent and approbation of their mistress, until the close of the Civil War in 1865, and that by reason of the emancipation proclamation of the federal government on January 1, 1863, the marriage so contracted was validated, and petitioners were legitimated.

Defendant claims as one of the universal legatees of William Johnson and by donation from Neonie, his lawful surviving wife.

The district judge decided in favor of the defendant. The Court of Appeals reversed the judgment and decided in favor of the plaintiffs. The case is before us on a writ of review sued out by the defendant.

William Johnson and Elizabeth Lee were slaves belonging to Ben Metoyer, late of the parish of Natchitoches. According to the allegations of the petition, William and Elizabeth were married about 1851, and four children were born to them, the last about 1855.

In 1864, during Banks' Red River Expedition, William and other slaves were sent into Texas. Elizabeth and her children remained on the plantation and followed the Federal army on its retreat after the battle of Mansfield. She remained in New Orleans and vicinity several years. She returned to Natchitoches in 1868, and found William living with one Neonie, born free of colored parentage. Elizabeth in 1869 married Baptiste, a fellow ex slave, and the parties lived together until the death of Baptiste early in the year 1906. William married Neonie in 1870, and they lived together until his death in January, 1894.

It appears that William informally adopted Onezime Raphael, the defendant, as his son. By his last will and testament William instituted his wife, Neonie, and Onezime, as his universal legatees. William's estate consisted mainly of 120 arpents of land which belonged to the community existing between him and Neonie. After his death his widow donated her interest in a certain one-half of the land to Onezime, and by a subsequent amicable partition he became the owner of the 60 arpents in dispute.

After April, 1864, William and Elizabeth never lived together, and never claimed each other as husband and wife; but on the contrary, both of them married other persons. Hence, if plaintiffs' contention be true, both of their parents committed bigamy.

Elizabeth Baptiste, 80 years of age, testified on the trial of the case. She does not testify that she and William were ever married formally or informally, but says, "We took up together as man and wife" with the consent of their master and mistress. Elizabeth admits that before she took up with William she had had a child by another man, and other evidence identified this man as Baptiste, who accompanied her to New Orleans, and whom she married in 1869. Elizabeth states that this was the only time she married. William had children by three or four other women, and one witness testified that he "took up" with these women after he had lived with Elizabeth.

If cohabitation with the consent of the master constituted marriage, it might well happen that a man slave might have had several living wives and a woman slave several living husbands.

In 1868 the Legislature passed an act to legalize all private or religious marriages contracted in this state prior to the passage of the act, and extended the benefit of its provisions to any parties who had lived together as man and wife, and who desired to contract a legal marriage, provided, however, that the parties, within two years from the date of the act, should by authentic act make a declaration of their marriage, the date on which it was contracted, the names, sex, and ages of the children born of said marriage,

acknowledging said children as their legitimate offspring, etc. See Act 1868, p. 278, No. 210; Rev. St. 1870, §§ 2212–2216.

Neither William nor Elizabeth manifested any desire to avail themselves of the benefit of this curative act.

The Court of Appeal virtually held that the consent of the master and the consent of the parties, coupled with cohabitation, constituted a valid marriage and fixed the rights of the children as legitimate heirs.

The court cited article 182 of the Civil Code of 1825, which reads as follows:

"Slaves can not marry without the consent of the master, and their marriages do not produce any of the civil effects which result from such a contract."

In the case of Girod v. Lewis, 6 Mart. (O. S.) 559, decided in 1819, it was held that the marriage of a slave on his emancipation "produces all the effects which result from such a contract among free persons." In that case there was "a contract of marriage, legal and valid by the consent of the master and moral assent of the slave."

In Pierre v. Fontenette, 25 La. Ann. 617, it was held that the slave marriage must have existed at the time the emancipation took place. In that case the alleged slave husband had died prior to emancipation.

In Succession of Henry Pearce, 30 La. Ann. 1168, two slaves, with the consent of their masters and in presence of a large assemblage, were "married by a minister of the Gospel of their class, and lived as man and wife, and so acknowledged by all who knew them, until the death of Henry Pearce, in 1875."

In Ross v. Ross, 34 La. Ann. 860, the parties were married in 1842, with the consent of their owners, and after they were both free continued to cohabit as man and wife. The court considered such a cohabitation as a ratification of the marriage.

In Sterrett v. Samuel, 108 La. 346, 32

South. 428, the parties were married in the house of the owner of the bride by a white minister, and continued to live together as man and wife long after their emancipation.

Under the Civil Codes of 1825 and 1870 marriage is a solemn contract, which must be celebrated by a priest or minister or a magistrate, in the presence of three witnesses.

While article 182 of the Civil Code of 1825 is pregnant with the affirmation that slaves may marry with the consent of their masters, it surely contemplated some kind of a public celebration of the contract of marriage.

The Civil Code does not recognize marriages by private agreement or as resulting from cohabitation as man and wife.

Slave marriages were binding in morals, but did not produce any of the civil effects which result from such a contract. Hence, when the parties were emancipated, they were at liberty to withdraw from or continue their relations. Logically, a slave marriage can only be validated by ratification or express legislation. In 1868 the Legislature gave all persons who had lived together as man and wife an opportunity to legalize their relation and legitimate their offspring by a formal declaration before a notary public. The very act itself recognized that pretended marriages resulting from private agreement and from cohabitation were null and void under the existing laws of this state.

In the instant case the evidence and the subsequent conduct of the parties show that no marriage, formal or informal, was ever celebrated between them, and it is further shown that they were separated while held in bondage and never cohabited as man and wife after they were emancipated. Each of them repudiated their former irregular relations by subsequent lawful marriage with other persons.

It is therefore ordered, adjudged, and decreed that the judgment of the Court of Appeal be annulled, avoided, and reversed, and it is now ordered that the judgment of the

district court be affirmed, plaintiff to pay costs in both appellate courts.

PROVOSTY, J., holding the view that cohabitation after emancipation suffices of itself to effect the ratification of a slave marriage, can concur only in the decree.

MONROE, J., also concurs in the decree.