Napier *v.* Church *et al.*

(*Jackson.*   April Term, 1915.)

1. **WILLS.  Probate.  Legitimacy of contestant.**
Where the proponent of a will, upon petition to contest as heir of
decedent, alleges the illegitimacy of the contestant, the deter-
mination of such contestant's right is the initial inquiry, sep-
arate from and preliminary to the contest itself.  (*Post, p.* 115.)
Cases cited and approved:   Shaller v. Garrett, 127 Tenn., 665;
Cowan v. Walker, 117 Tenn., 135.

2. **MARRIAGE.  Slaves.  Effect.**
Since slaves could not contract, they could not enter into a valid
marriage, and from their unions no civil rights could spring, so
that the issue were incapable of inheriting property, the mar-
riage being a mere cohabitation, subject to termination at the
will of the master.  (*Post, p.* 118.)

3. **DESCENT AND DISTRIBUTION.  Legitimacy.  Controlling
law.**
While, as to the right of inheritance, the *status* of a party as
to legitimacy depends upon the law of the domicile of the par-
ents, nevertheless where such State is foreign to that of the
decedent at the time of his death, where his property is situated,
the laws of such State, as to the party's right of inheritance,
are not controlled by those of the foreign State, since every
State determines for itself what classes of persons may inherit
property owned by citizens in the State at the time of their
death.  (*Post, p.* 118.)

4. **SLAVES.  Issue of slave marriage.  Statutory right to inherit.**
The right of any issue of a slave marriage to inherit depends
solely upon statute, since before emancipation no right of in-
heritance could flow from such a union.  (*Post, p.* 119.)
Case cited and approved:   Jones v. Jones, 234 U. S., 619.

5. **SLAVES. Slave marriage. Validation. Louisiana law. Statute.**

Under act of 1868 of the State of Louisiana (Act No. 210 of 1868), providing for the validation of slave marriages, such a validation might be effected by a declaration of marriage before a notáry public, while the courts of that State adopted another rule that such marriages might be validated by mere cohabitation as man and wife after emancipation, although there is no decision that a mere meeting of the parties thereafter, without resuming the relationship of marriage, effects a validation. (*Post, p. 119.*)

Cases cited and distinguished: Girod v. Lewis, 6 Martin O. S. (La.), 559; Pierre v. Fontenette, 25 La. Ann, 617; Succession of Pierce, 30 La. Ann., 1168; Ross v. Ross, 34 La. Ann., 860; Succession of William Thomas, 1 Ct. App., 124; Johnson Heirs v. Raphael, 117 La., 967; Succession of Walker, 121 La., 865.

6. **SLAVES. Slave marriage. Validation under foreign law. Comity. Certainty of law.**

Where it is urged that the issue of a slave marriage is legitimate, on account of the validation of the marriage under the laws of a foreign State, to enable such issue to inherit property here, there must be some clear and convincing law of the foreign State, either by statute or court decision, to warrant the court in declaring legitimacy. (*Post, p. 124.*)

7. **SLAVES. Validity of slave marriage. Statute.**

Under Acts 1865-66, ch. 40, providing that persons of color have the right to make and enforce contracts, sue and be sued, be parties and give evidence, to inherit, and to have the benefit of all laws and proceedings for the security of person and estate, and under Shannon's Code, sec. 4179, providing that all free persons of color who were living together as husband and wife in this State while in a state of slavery are man and wife, and their children legitimately entitled to an inheritance in any property of such parents to as full an extent as the children of white citizens, the issue of a slave marriage, contracted and terminated before emancipation in Louisiana, the parties to which never lived together in this State, was not legitimized

to inherit from the father, a citizen here at the time of his death. (*Post*, *p.* 124.)

Cases cited and approved: Shepherd v. Carlin, 99 Tenn., 64; Carver v. Maxwell, 110 Tenn., 75; Jones v. Jones, 234 U. S., 616.

Code cited and construed: Sec. 4179 (S.).

8. **SLAVES. Slave marriage. Validation. Statutes. "Living together."**

Under Acts 1865-66, ch. 40, as amended by Acts 1887, ch. 151, Shannon's Code, sec. 4183, making the Code provision that all free persons of color living together in this State as husband and wife while in a state of slavery are man and wife, and their children legitimate and entitled to inherit, applicable to persons of color "living together" as man and wife in other States, who have moved to this State, the issue of a slave marriage, contracted and terminated previous to emancipation in the State of Louisiana, the parties never thereafter having moved to this State, was not legitimized to inherit from the father, dying a citizen of this State, where the father, who had been a body servant of a steamboat captain, had visited his slave wife in New Orleans only occasionally, when his master's boat was in port there, since the words "living together" imply a habitat or place of domicile, where both parties reside or have their home. (*Post*, *p.* 125.)

Acts cited and construed: Acts 1887, ch. 151.

Code cited and construed: Secs. 4179, 4180, 4182, 4183.

9. **CONSTITUTIONAL LAW. Equal protection of law. Slave marriage. Legitimacy of issue.**

The court was not forbidden by Const. U. S. Amend. 14, to hold that, for purposes of inheritance, the issue of a slave marriage contracted in Louisiana and there terminated before emancipation, was illegitimate. (*Post*, *p.* 128.)

Cases cited and approved: Sneed v. Ewing, 5 J. J. Marsh. (Ky.), 460; Hall v. U. S., 92 U. S., 27; Jones v. Jones, 234 U. S., 619.
132 Tenn.8

Napier v. Church.

10. **CIVIL RIGHTS.    Rights protected.    Inheritance.    Issue of slave marriage.    Legitimacy.**

The federal Civil Rights Act March 1, 1875, ch. 114, 18 Stat. 335 (U. S. Comp. St. 1913, sec. 3926) does not forbid the Tennessee courts to hold that, for inheritance purposes, the issue of a slave marriage, contracted in Louisiana and terminated there before emancipation, was illegitimate.    (*Post*, *p.* 128.)

FROM SHELBY.

Appeal from the Probate Court of Shelby County to the Court of Civil Appeals, and by *certiorari* from the Court of Civil Appeals to the Supreme Court.— JACOB S. GALLOWAY, Judge.

WRIGHT, MILES, WARING & WALKER, for plaintiff.

S. M. NEELY and M. R. PATTERSON, for defendant.

MR. JUSTICE FANCHER delivered the opinion of the Court.

Robert R. Church, who was an ex-slave, died in Shelby county, Tennessee, in August, 1912. Soon after his death an instrument purporting to be his last will and testament was admitted and placed of record. Laura C. Napier filed her petition in the probate court of Shelby county to contest the will. She asserts in her petition to contest that she is the daughter of Robert R. Church, and thus entitled to inherit from her father. Upon the determination of the question as to whether

she may inherit will depend her right to make this con-
test.

The proponent of the will interposed an answer al-
leging, among other things, the illegitimacy of Laura
C. Napier and denied her right to contest the will. This
presents an issue separate from and preliminary to
the contest itself. *Shaller* v. *Garrett,* 127 Tenn., 665,
156 S. W., 1084; *Cowan* v. *Walker,* 117 Tenn., 135,
96 S. W., 967.

This issue was heard before Hon. Jacob S. Galloway,
judge of the probate court of Shelby county, sitting
without the intervention of a jury, with the result that
the court found that Laura C. Napier was a legitimate
daughter of said Robert R. Church by virtue of a
valid slave marriage contracted in the State of Louis-
iana, and was endowed with rights of inheritance and
entitled to participate in the descent and distribution
of the estate. It was ordered that the instrument
purporting to be the will of Robert R. Church be cer-
tified to the circuit court of Shelby county, where
Laura should contest it.

From this order of Judge Galloway the proponent
appealed to the honorable court of civil appeals, where
the case was heard, with the result that the findings
of Judge Galloway were reversed, and said petition
and application to contest denied and dismissed. This
was a proper appeal under the law applying to the
probate court of Shelby county. From the decision of
the court of appeals the said Laura C. Napier has peti-
tioned this court for a writ of *certiorari,* which has

been granted, and the case has been argued at the bar of this court upon the assignments of error.

The whole question involved is whether or not Laura C. Napier is a legitimate child of the said Robert R. Church. This question involves a construction of the laws of the States of Louisiana and Tennessee on the subject of the right of children of former slaves to inherit property.

Robert R. Church was a slave and body servant of Capt. Charles B. Church, who, prior to the Civil War, was the master of a number of steamboats running the waters of the Mississippi river between the cities of New Orleans, Memphis, and St. Louis. He was a resident and citizen of Memphis, Tennessee, and consequently that was the place of residence of his slave, Robert R. Church. The latter accompanied Capt. Church on his regular trips from Memphis to New Orleans, and would accompany his master to and from the boat and generally wherever he went.

About the year 1857, Robert R. Church intermarried in New Orleans with a slave woman by the name of Margaret Pico, according to the custom of slave marriages, and with the consent of his master, as well as well as with the consent of the master of Margaret Pico. When the boat would land at New Orleans, Capt. Church would visit at the home of the Pico family, who were friends of his. The boat would remain at New Orleans only a short time, some few days on each trip. After this slave marriage, when the boat would land at New Orleans, Robert R. Church would visit Mar-

garet Pico, and there was born to this slave marriage at New Orleans before the Civil War the said Laura. Soon after the birth of Laura, Capt. Church ceased to run the river, and Robert Church was retained permanently by him in Memphis, thereby entirely separating him from his slave wife, which by the custom and laws of the times produced a divorce.

In the year 1862, Robert R. Church again married, with the consent of his master, according to the custom of slave marriages, at Memphis, in the presence of Capt. Church and the owner of Louise Ayers, the slave woman whom he married. Margaret Pico also married again about 1865.

After the emancipation, probably about 1866, Robert R. Church made a visit to New Orleans, and called upon his former wife, he then being married to Louise Ayers, and Margaret being married to another man, and requested of his former slave wife that he be allowed to take their daughter Laura, and care for her and place her in school. The mother of the child agreed to this, and in a year or so the negro father again returned to New Orleans and made arrangements for the contestant to be sent to him at Memphis. He thereupon arranged with an old steamboat friend of his to bring Laura to him, which was done. She was place by Church in Fisk University at Nashville, where she remained during the academic year 1868-69, and registered there as a student as Laura Church of Memphis. Afterwards she attended school at New Orleans, and married in 1878, continuing her residence

in New Orleans. She and the said Robert R. Church corresponded occasionally. She was never made a member of the household of Robert Church, but resided at New Orleans, St. Louis, and other places. There was never any cohabitation between Margaret Pico and Robert Church after their separation prior to the Civil War. Robert R. Church was finally divorced from his Memphis wife and married again. There were born to 'these two marriages in Tennessee four children. Robert Church left a widow at the time of his death. His estate is very large for that of a colored man, amounting to probably $600,000.

These slave marriages were peculiar, being dependent upon the consent of the master, and he could divorce them at will. Slaves could not contract, and therefore were incapable of entering into relationship of a valid marriage. No civil rights could grow out of a slave union and slaves were incapable of inheriting property from each other. The slave marriage was a mere cohabitation, with some degree of regularity to give it a sense of decency, and subject to be absolutely terminated at the will of the master at any time. No right of inheritance could grow out of a slave union. Since the war between the States, however, various statutes have been enacted in the former slaveholding States of the Union, by which with limitations children of these slave unions were enabled under certain conditions to inherit.

We will now inquire as to what the law of Louisiana was with respect to such rights of inheritance of such

persons in order to determine whether there be any inheritable blood in Laura C. Napier. Preliminary to this question, it may be said that the *status* of the parties as to legitimacy will depend as a rule upon the law of domicile. But every State determines for itself as to what class of persons may or may not inherit property owned by citizens in the State at the time of their death. Each State makes its own laws of descent and distribution according to its own sovereign will, and such laws are uncontrolled and unaffected by the laws of any State where any person may be domiciled who might have an interest. So, it is important to determine whether there be any right of inheritance in this contestant, the child of a slave marriage in Louisiana.

Before the emancipation, no right of inheritance could flow from such a union, and if any right now exists it must be determined by the statutes of Louisiana and the statutes of Tennessee. See Rodgers on Domestic Relations, sections 596, 597; Story on Conflict of Laws, section 483; *Jones* v. *Jones,* 234 U. S., 619, 34 Sup. Ct., 937, 58 L. Ed., 1500, and cases there cited.

There are only two statutes upon the subject in the State of Louisiana. Article 182 of the Civil Code of 1825 is as follows:

"Slaves cannot be married without the consent of their masters, and their marriages do not produce any of the civil effects which result from such contract."

This remained the law in the State of Louisiana until the passage of the act of 1868, No. 210, which provided as follows:

"That all private or religious marriages contracted in this State at any time previous to the passage of this act shall be deemed valid and binding and as having the same force and effect as if the said marriages had been contracted with all the formalities and forms prescribed by law then existing; provided, that at any time within two years from the date of this act the parties having contracted such private or religious marriages shall by an authentic act before a duly commissioned notary public, if they reside in the State, . . . make a declaration of their marriage, the date on which it was contracted, the names, sex and ages of the children born of said marriages, acknowledging said children as their offspring."

The courts of Louisiana adopted another rule by which slave marriages might be validated in addition to that enacted by statute, holding that it was not necessary for the parties to make a declaration of marriage before a notary public, but that slave marriages could be validated by the parties cohabiting as man and wife after emancipation. But no case has been found from the authorities of that State holding that there could be a validation of a slave marriage by a mere oral recognition or statement by the parties after emancipation that they had been married during slavery. The Louisiana cases on this subject are the following: *Girod* v. *Lewis*, 6 Martin O. S. (La.), 559; *Pieere* v

*Fontenette,* 25 La. Ann., 617; *Succession of Pierce,* 30 La. Ann., 1168; *Ross* v. *Ross,* 34 La. Ann., 860; *Succession of William Thomas,* 1 Ct. App., 124, 114 La., 693, 38 South., 519; *Johnson Heirs* v. *Raphael,* 117 La., 967, 42 South., 470; *Succession of Walker,* 121 La., 865, 46 South., 890.

It was held by these authorities that slave marriages were binding in morals, but that they did not produce any civil effects.    Hence the parties when emancipated were at liberty to withdraw or continue their relations, and it appears that the ratification which was recognized by the Louisiana courts was a ratification by cohabitation after the slaves were freed. The law of Louisiana gave them the right to legalize their former relations and legitimatize their offspring by formal declaration before a notary public or a continuation of cohabitation as man and wife after they became competent to act upon being emancipated.

In the case of *Succession of Walker,* 121 La., 865, 46 South., 890, the court said:

"Pretermitting the question whether living together and cohabitation after the emancipation of the parties is absolutely essential to. the ratification of such marriage, it is clear that ratification required some sort of affirmative action" concurred in by both minds "and that, where the parties were separated before their emancipation and never met afterwards, it could not have resulted from their mere silence, and still less where, by his or her conduct, one of the parties had indicated an intention of establishing relations inconsist-

ent with those established by the marriage to be ratified. In the instant case the evidence fails to satisfy us that there was ever any attempt or intention on the part either of Henry or Henrietta W—— to maintain their marriage relation after they were emancipated.''

A ratification by cohabitation of the parties was impossible so far as Robert R. Church and Margaret Pico were concerned after they were emancipated, because Robert Church was married to another woman and Margaret Pico was married to another man, and hence they were incapable of entering into the former relationship.

As to what consent was necessary to produce a ratification of a slave marriage has not been definitely determined by the Louisiana courts, but none of the cases go to the extent of holding that a mere meeting of the parties after emancipation and talking over their former relations or about their child or children, without again resuming the relationship of marriage, could have the effect to validate. Robert R. Church after the war went to New Orleans and called upon his former slave wife, and they talked about their child, but this was not a ratification of the marriage. If one be without the capacity to contract at the time of the doing of any particular thing, in order that he may thereafter ratify and confirm such act, he must at that time be possessed of the capacity to ratify. In the case at bar, there was neither the intention nor the capacity of the parties to renew their former relationship.

It is insisted by counsel for the petitioner, that the opinion in the case of *Succession of William Thomas,* supra, affords authority for their position that there was a ratification by Robert Church and Margaret Pico in the meeting at New Orleans and recognizing that the child Laura was their child, and they insist that that involved also a recognition of their former marriage.

In the case of *Succession of Thomas,* the slave husband and wife had been separated before emancipation. The wife and her children had been carried to Texas, leaving the husband in Louisiana with his master. After the war the woman returned to Louisiana, made search for her former husband, found him, and remained with him and her children at her husband's home at least two days, and then by reason of the fact that he was living in open concubinage with another woman, there was a separation and division of the children. The court makes it clear in that opinion that the former relationship was resumed, and says, "Then came a separation and division of the children." The court goes on to say:

"The husband and wife were brought together again; the wife and her children remained under the same roof with her husband for several days; the wife refused to remain longer owing to the presence of her husband's concubine; the husband making no denial of the marriage nor repudiating same, but on the contrary, received his wife under his roof as his wife, recognized his children as his lawful offspring and subsequently

consenting to a separation, each taking and caring for an equal number of children.''

From these acts of recognition and cohabitation the court held there was a ratification of the marriage and hence a legitimation of the children.

If we are to adopt the law of Louisiana upon the subject of the *status* of these parties socially, and this must be done as a matter of comity if at all, then we should find some clear and convincing law of that State either by statute or the clear and unmistakable holding of the courts, before we would be justified in doing so. We find no such law in Louisiana. .

We will now turn to the Tennessee laws upon the subject. The first statute passed in Tennessee validating slave marriages or legitimatizing the issue of such unions is the statute of 1865-66, chapter 40. The second section of that act is in pursuance of the Bill of Rights and in recognition of the fourteenth amendment to the federal constitution, and provides:

''That persons of color have the right to make and enforce contracts, to sue and be sued, to be parties and give evidence, to inherit, and to have full and equal benefits of all laws and proceedings for the security of person and estate.''

It is insisted that this section of the act recognizes the right of inheritance among slaves generally, and would embrace the right of Laura C. Napier to inherit from Robert R. Church. We think not. That section is one of a general nature, recognizing that there shall be no distinction between white persons and persons of

color, so far as civil rights are concerned, but it does not go back and make legal and valid these former slave marriages so as to produce civil results therefrom. Section 5 of said act, which is carried into Shannon's Code, section 4179, expresses the legislative enactment in that statute with respect to inheritance by children of former slaves. It is as follows:

"All free persons of color who were living together as husband and wife in this State while in a state of slavery, are hereby declared to be man and wife, and their children legitimately entitled to an inheritance in any property heretofore acquired, or that may hereafter be acquired, by said parents, to as full extent as the children of white citizens are entitled by the laws of this State."

This section of the act does not apply here because it is restricted to slaves who had been living together within the State as man and wife. This is patent from the face of the act itself and is the interpretation heretofore given by the courts. *Shepherd* v. *Carlin,* 99 Tenn., 64, 41 S. W., 340; *Carver* v. *Maxwell,* 110 Tenn., 75, 71 S. W., 752; *Jones* v. *Jones,* 234 U. S., 616, 34 Sup. Ct., 937, 58 L. Ed., 1502.

But it is said that the legislature of Tennessee has extended the provisions of law on this question by the Act of 1887, chapter 151, which is carried into Shannon's Code by section 4183. This act is as follows:

"An act to amend the laws of descent and distribution, and to amend sections 3285, 3286, 3287, and 3288 of the Revised Code.

"Section 1.   Be it enacted by the general assembly of the State of Tennessee, that section 3285 of Milliken & Vertrees' Code be so amended as to include in its provisions persons of color, who have been living as man and wife in other States, and who have moved to this State; and that sections 3286, 3287 and 3288 of Revised Code be applied to such persons and their issue, whether born in this State or elsewhere."

The sections 3286, 3287, 3288 referred to above as sections in Milliken & Vertrees' Code are the same as sections 4180-4182 in Shannon's Code.   Those three sections have no bearing upon the question under consideration, and it must be determined by the first clause of this act.

If we may look to "section 3285 of Milliken & Vertrees' Code," which is not really a Code, but a compilation of laws, to determine the law here amended, we will find that this first section 5 of the Act of 1865-66 above referred to, or section 4179 of Shannon's Compilation above copied, provides that:

"All free persons of color who were living together as husband and wife in this State while in a state of slavery, are hereby declared to be man and wife, and their children legitimately entitled to an inheritance in any property heretofore acquired, or that may . . . be acquired, by said parents, to as full an extent as the children of white citizens . . . of this State."

So that this amendatory act of 1887 if it may be referred to any law merely includes in the provisions above quoted "persons of color who have been living together as man and wife in other States who have moved to this State."

The statute sought to be amended clearly does not apply to these parties because Robert R. Church and Margaret Pico did not live together as man and wife in this State. This amendment we think cannot apply because it only embraces those persons of color who have been living together as man and wife in other States and who have moved to this State. Robert R. Church and Margaret Pico did not live together as man and wife in another State. The words "living together" imply a habitation or place of domicile where they both reside or have their home. The home of Robert Church was with his master, Capt. Church, at Memphis. He did not live in New Orleans, where Margaret Pico lived with her master and mistress. The domicile of the slave was that of his master. He only visited his slave wife at periods when the boat would land at New Orleans on its trips from Memphis, and then could only visit her at the convenience of his master, and the boat would only stay at New Orleans for a few days at a time. Then again, Robert Church and Margaret Pico did not move to this State. Margaret Pico never did move to Tennessee, and Robert lived here from the beginning. So, very clearly, the petitioner does not come within the provisions of this amen-

datory statute, if we may concede it to be a valid and constitutional act.

Four of the members of the court of civil appeals took the view here indicated, but the writer of the opinion, Mr. Justice Higgins, did not concur in that view. He thought that the legislature in passing this act intended to embrace a case such as is here presented. We think the majority of that court were correct in their view on this subject. That court by unanimous opinion concluded that this act of 1887 was unconstitutional on grounds set forth in the opinion. That question had not been raised by counsel before the court, and we do not see proper to discuss the constitutionality of the act, for the reason that we deem it entirely unnecessary.

There only remains one other question raised on this petition to be here determined. It is insisted that any view of the law inconsistent with petitioner's contention in which her right of inheritance may be denied as a free person of color would be violative of the fourteenth amendment to the federal constitution, providing for equality before the law, and the Civil Rights Statute.

The denial of the right of Laura C. Napier to inherit as the legitimate child of Robert R. Church is in no sense a violation of any of the rights granted by the fourteenth amendment and the civil rights statutes. The State has the undoubted right to prescribe those persons who shall and who shall not inherit property within its boundaries under such regulations as pro-

vided in these laws applying to children of former slaves. There is no law or constitutional provision requiring the courts of this State to recognize as legitimate the issue of any irregular union, whether they be white or black.

It is within the power of the State to make just discrimination as to what class of persons may inherit. Tennessee has passed laws legitimating the offspring of slave marriages where the parents lived in this State as husband and wife while in a state of slavery, and if the act of 1887 be constitutional, then applying to the children of former slaves where the parents lived in another State as husband and wife and removed to this State. There is no unjust discrimination in this. The issue of these slave marriages could not inherit at all under their former *status,* and cases of this kind are similar to statutes of legitimation and adoption whereby persons may inherit property.

There is no discrimination in this as between white and colored persons. These laws were passed in order to better the conditions of these unfortunate people. The provision of our law requiring a residence in this State by the husband and wife has a wise purpose behind it. It would be an easy matter for designing persons to work up proof of slave marriages during the old days of slavery, and great imposition might be practiced but for the requirement that the parties shall live together as husband and wife after emancipation. The lawmaking bodies, as well as the courts of Louisiana and Tennessee, have doubtless had this danger in view.

132 Tenn.9

We are not inclined to loosely, by judicial construction, admit persons to such relationships who do not come within the rules defined by the legislature and by the courts.

The former slaveholding States have always appreciated the unfortunate situation of these people who formerly served their masters so faithfully and well. Certainly there has been no intention to discriminate against them in any respect. The statutes have been passed as humane and wholesome laws for their own benefit, and they have been favored by the enactments. We do not consider that this question is an open one. *Sneed* v. *Ewing,* 5 J. J. Marsh. (Ky.), 460, 22 Am. Dec., 41; *Hall* v. *U. S.,* 92 U. S., 27, 23 L. Ed., 597; *Jones* v. *Jones,* 234 U. S., 619, 34 Sup. Ct., 937, 58 L. Ed., 1500.

We find no error in the result reached by the court of civil appeals, and its judgment is affirmed.