PROYOSTY, C. J.
The succession of Ebenezer Gou is claimed by the children of his deceased half-sister, Mary O’Gee. Ebenezer Gou and Mary O’Gee were born of the same mother. This mother after the death of her first husband, the father of Mary, married the father of Ebenezer. These were slave marriages, which produced no civil effects. C. C. of 1825, art. 182.
Counsel for claimants recognize that the legitimacy of the children of a marriage is one of the civil effects of the marriage, and recognize also that a slave marriage in this state produced no civil effects, and therefore did not superinduce the legitimacy of the children of the marriage; and finally, they recognized that a surviving spouse inherits to the exclusion of a natural sister (Nereaux’s Est., 112 La. 572, 36 South. 594); and they do not contest the fact that Ebenezer Gou was survived by a lawful wife.
But they contend that as an effect of the Emancipation Proclamation the slave marriage of Mary O’Gee’s mother with her first husband, father of Mary O’Gee, matured into the status of a marriage productive of civil effects.
This court has decided that a slave marriage attained such legal status only if it was in existence at the date of the emancipation, and then only if the parties continued their marital relation. Pierre v. Fontenette, 25 La. Ann. 617.
Counsel contest the correctness of this decision. They argue:
“If slaves could be legally married before emancipation, and if the proclamation of emancipation conferred upon such legal marriages retroactively, as it indisputably did, full civil consequences, then why should it be necessary in order to confer upon the posterity of such union the status of legitimacy, and the right of inheritance, that such marriage relationship should continue after the proclamation of emancipation?”
The answer is that the Emancipation Proclamation did not confer on slave marriages retrospectively civil consequences. The said proclamation had nothing to do 'with slave marriages ; it confined itself to freeing' the slaves. The effect of this was to enable them to contract; to consent that their marriage, which theretofore had not been a contract. binding upon them, from which legal consequences flowed, should henceforth be such; and, as a necessary incident, should stand as if of that character from the beginning. But the effect was not that their slave marriage should, nolens volens, become a binding, legal marriage.
The father of Mary O’Gee was never a free man; he died before the power to consent to a legal contract was áecorded him; he was never bound by any legal marriage ties; had he lived to the date of the proclamation, he could have elected to recede from his slave marriage. Thousands upon thousands of ex-slaves so elected and married other women. All these second marriages were bigamous, if the doctrine of counsel that the Emancipation Proclamation raised slave marriages to the status of legal marriages were correct, and another consequence would be that the children of those thousands of slave marriag'es that were never ratified after emancipation, either because the spouses were already separated, or were dead, or were unwilling to ratify, would be legitimated. What inextricable confusion this would bring about can be easily imagined.
The judgment below rejected the demand of claimants.
Judgment affirmed.