(117 So. 150)

No. 28403.

## SUCCESSION OF YOUNG.

April 9, 1928. Rehearing Denied May 7, 1928.

Dart & Dart, of New Orleans, for appellant Valladay.

Normann, Breckwoldt & Schwartz, of New Orleans, for appellee Newman.

OVERTON, J. Albertine Young died in the city of New Orleans on September 29, 1925, intestate, leaving real and personal property, a few debts, a husband, and certain persons who claim to be collaterally related to her. She left neither ascendants, nor descendants. She was married twice, the first time to Thomas S. Birley, and a few days before her death to Samuel Valladay.

Shortly after the death of Albertine Young, William Newman, who alleges himself to be a first cousin of the deceased, petitioned to be appointed administrator of her succession. He was joined in this request by Irene Young, widow of James Hallum, and Victoria Young, widow of Edward Hallum, who claim to be half-sisters of the deceased. Samuel Valladay, who married the deceased shortly before her death, filed an opposition to the appointment of Newman as administrator, and alleged that he should be appointed administrator, basing his claim to the appointment, in preference to Newman, on the ground that the deceased left no relations, and hence that Newman was not related to her, and that he, as surviving spouse, was her only heir and entitled to the appointment.

The solution of the case is dependent upon whether Albertine Young was legitimate. If she was, then she left relations, among whom was Newman, and, as the property left by her belonged to her separate estate, Valladay is not her heir for any part of it, and is not entitled to the administration. On the other hand, if the deceased was illegiti-

mate, she left no relatives, and Valladay, as surviving spouse, is her only heir, and is entitled to the administration. C. C. art. 917 et seq.; Succession of Ducloslange, 2 La. Ann. 98.

The deceased was the child of Jane Anderson and Whig Young. Jane was one of a number of children who were the issue of a slave marriage entered into by Sampson and Esther Anderson. Sampson and Esther belonged to a Mr. Sheldon, who was the owner of a sawmill, located in the outskirts of New Orleans. Jane, who was Sampson's and Esther's daughter, grew to young womanhood in slavery, in the ownership of Sheldon. Whig Young, who Newman contends married Jane during slavery, was owned by a person other than Sheldon.

Only two of the children of Sampson and Jane Anderson were alive when this case was tried. These children were Mary and Susan Anderson. Both of them were sworn as witnesses in the case. Mary was 84 years of age at the time. Her memory, as appears from the record, was weak and uncertain, which affects the probative value of her evidence. She testified that she was the sister of Jane Anderson, the mother of the deceased; that her parents, together with their children, lived in the same house; that Jane was the wife of Whig Young, but that she does not remember where Jane and Whig were married, or how long they lived together as man and wife. She also said that Jane and Whig were residing together at the time Albertine was born, though their relations were broken at times by short separations, and that Jane died when Albertine was about 16 or 17 months old. She further testified that Whig and Jane resided together as man and wife before emancipation, though she could not say for how long. She then said that they lived together, that is, for the first time, shortly after emancipation, and persisted in this for a moment or two, and then corrected herself by saying

that they resided together before they were freed. She testified on the second trial, which was held a few months later, that Whig and Jane lived together until the latter died, which, according to the witness' statement, was when Albertine was 16 or 17 months of age.

Susan Anderson testified that she was 76 years old at the time of the trial. When asked if she knew when Whig Young and Jane Anderson were married, she said that she was not at home all the time; that she was out working, but that she understood and heard that they were; that Jane told her in front of St. Rose de Lima's Church that she was married; that after that time, Jane and Whig lived on Rampart street and then on Carondelet. She also said that they lived together until Albertine was born, or about that time; that after Jane left Whig she never returned to him, because Whig had not acted properly towards her, and that she lived with Jane after the separation, and nursed Albertine after the latter was a week old. She does not attempt to fix the time when she heard that Jane was married, though she says she was then quite small.

William Hanneman, who was the son-in-law of Mr. Sheldon, the owner of Jane Anderson, testified that he knew Jane's father and mother; that her parents lived together as husband and wife, during slavery and after emancipation; that they were recognized as such; and that they reared a large family; that when Lincoln's proclamation was issued, the slaves on the place were called together and told that they were free and must go, as their owner was unable to provide for them; that he knew Jane Anderson, and knew that she had one child, Albertine; that Jane brought Albertine from time to time to his home, when she was a baby; that, after Jane's death, Albertine's aunt (Matilda Newman) cared for her; and that he did not know whether Albertine's

father and mother were married, or who her father was.

It appears from a baptismal certificate in the record that Albertine Young was born about April, 1865, and was baptised on November 20th of that year. It also appears that Whig Young never provided for Albertine or paid her any attention, save possibly to call to see her a few times during her infancy; that Albertine was reared partly in an orphan asylum and partly by Matilda Newman; and that, when her father died, she did not attend his funeral. Evidence was also offered to show marriage by reputation, but the evidence offered for that purpose is very meager.

■ The law permitted slaves to marry, upon condition that they obtained their master's consent, but provided that the marriage should not produce any civil effects. The civil effects of such marriages remained dormant during the condition of slavery, but upon emancipation, if the parties continued to live together as husband and wife, thereby confirming the marriage, the civil effects of the marriage came into being as of the date it was contracted. Ross v. Ross, 34 La. Ann. 860.

■ The burden of establishing a marriage rests upon those who claim under or by virtue of it. Doiron v. Vacuum Oil Co., 164 La. 15, 113 So. 748; Succession of Washington, 153 La. 1047, 97 So. 35; In re Nereaux's Estate, 112 La. 572, 36 So. 594; McConnell v. City of New Orleans, 15 La. Ann. 410; Casimir v. Blanc, 10 Rob. 448.

In the Succession of Washington, 153 La. 1047, 97 So. 35, where the plaintiffs claimed to be the issue of a slave marriage, it was said:

"The burden of proof is upon plaintiffs. In order to establish the validity of the alleged slave marriage, it is incumbent upon them to show: (1) consent of the parties; (2) consent of the masters; (3) a ceremony; and (4) ratification by the parties subsequent to their emancipation. Succession of Walker, 121 La. 865, 46 South. 890; Johnson's Heirs v. Raphael, 117 La. 967, 42 South. 470."

■ The evidence is not such as to justify us in concluding that there was a marriage between Whig Young and Jane Anderson. Moreover, we are inclined to the view that they were never married. There is no evidence showing that the master of either ever granted consent to the marriage, yet consent of the masters was necessary to a slave marriage; nor is there any evidence from which it may be reasonably inferred that such consent was granted, especially by the master of Whig Young, whose name does not even appear. And should we hold, as was held in Johnson's Heirs v. Raphael, 117 La. 967, 42 So. 470, that some form of ceremony was necessary to the validity of the marriage, it may be observed that there is not any evidence of a ceremony. We find it strange that neither Mary nor Susan Anderson know where the marriage occurred, or more about it than its mere occurrence, if it did occur. They were in position to know more. It is true that Mary was old when she testified, but she should have recalled more concerning the marriage, if it took place, than the mere fact of its occurrence. It is also true that while Susan says she was young when the marriage occurred, yet if it took place prior to the proclamation of emancipation, she must have been at the time between 12 and 15 years of age, and should have known more about the marriage than its mere occurrence, if it did occur.

In our view there was no marriage prior to the issuance of the proclamation, or prior to January 1, 1863, the date the president declared the proclamation should become effective. What we think occurred was that, after the proclamation of emancipation was issued, or after the date it was ordered to become effective, and after Sheldon, as a result of the proclamation (New Orleans then being under the control of the Federal

troops), called his slaves together and told them that they were free and must leave, Whig Young and Jane Anderson began living together.

This view is supported by the fact that when Susan Anderson says that Jane told her she was married—something that Jane would hardly have concealed from her sister for any length of time—she (Susan) was working in New Orleans, and that Whig Young and Jane Anderson thereafter lived on Rampart street and then on Carondelet street in that city. It is unlikely that Susan was working in New Orleans and Jane living in that city prior to the time that Sheldon told his slaves that they were free and must leave. If we assume that the proclamation was not legally effective in New Orleans and its vicinity at that time, still we think it clear that Jane did not have the consent of her master to marry, for it is improbable that she would have asked his consent after she was told that she was free and must care for herself. If we assume that the proclamation was effective at that time, then there is no evidence of a marriage solemnized after the proclamation, according to the forms of law.

█ We also think that the manner in which Whig Young treated Albertine, by completely ignoring her, weakens the probabilities that there was a marriage between him and Jane, and that he looked upon Albertine as his legitimate daughter. We also think that the fact that Jane left Young about the time of the birth of Albertine, or that there was a separation between them, which we find to be a fact, since we think that Susan was in a better position to know than Mary whether there was, as Susan lived with Jane following the separation, detracts from the probabilities that there was such a marriage. As relates to the evidence offered to show marriage by reputation, it is too meager to establish a marriage.

For the reasons assigned, the judgment

appealed from is annulled and set aside, and judgment is now rendered appointing the opponent, Samuel Valladay, administrator of said succession, and ordering that letters of administration issue to him upon his complying with the law.